Citation Nr: 1717653 
Decision Date: 05/22/17 Archive Date: 06/05/17

DOCKET NO. 12-14 882 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, Michigan


THE ISSUES

1. Entitlement to service connection for residuals of ruptured eardrums, to include bilateral hearing loss.

2. Entitlement to an initial rating in excess of 10 percent disabling prior to August 16, 2014, and a rating in excess of 20 percent thereafter for left lower extremity (LLE) radiculopathy.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

Appellant



ATTORNEY FOR THE BOARD

C. Lamb, Associate Counsel


INTRODUCTION

The Veteran served on active duty from December 1972 to December 1974, with additional service in the Naval Reserves. 

This matter is before the Board of Veterans' Appeals (Board) on appeal from March 2011 and May 2013 rating decisions of the Detroit, Michigan, Department of Veterans Affairs (VA) Regional Office (RO). 

During the pendency of the appeal, a May 2014 rating decision granted an increased rating for LLE radiculopathy of 20 percent, effective April 16, 2014. As this rating does not change the initial rating on appeal and is not the maximum allowable, that issue remains on appeal. AB v. Brown, 6 Vet. App. 35 (1993).

In January 2015, the Veteran testified at a Board videoconference hearing before the undersigned. A copy of the transcript of that hearing has been associated with the claims file.

In March 2015, the Board remanded this case and instructed the Agency of Original Jurisdiction (AOJ) to obtain all STRs related to the Veteran's bilateral ear surgery at the Naval Hospital in San Diego. The AOJ was additionally instructed to request releases authorizing the VA to obtain all private treatment records referenced at the Board hearing. The Board notes that the requested release and private treatment records were obtained in May 2015 and associated with the claims file. Additionally, the RO identified Naval Hospital STRs associated with the bilateral ear surgery that were already contained in the record. Accordingly, after reviewing the actions of the AOJ, the Board finds there was substantial compliance with the requested development. Dyment v. West, 13 Vet. App. 141 (1999); Stegall v. West, 11 Vet. App. 268 (1998).

The issue of service connection for residuals of ruptured eardrums is addressed in the REMAND portion of the decision below and is REMANDED to the AOJ.


FINDINGS OF FACT

1. The Veteran does not have any residuals related to his in-service bilateral otitis media or bilateral myringotomy.

2. The Veteran's bilateral hearing loss did not originate in service, within a year of service, and is not otherwise etiologically related to the Veteran's active service.

3. Prior to April 16, 2014, the symptoms associated with the Veteran's radiculopathy of the left lower extremity resulted in moderately severe incomplete paralysis of the sciatic nerve.

4. As of April 16, 2014, the symptoms associated with the Veteran's radiculopathy of the left lower extremity result in moderate incomplete paralysis of the sciatic nerve.


CONCLUSIONS OF LAW

1. The criteria for service connection for residuals of ruptured eardrums, to include bilateral hearing loss, are not met. 38 U.S.C.A. §§ 1110, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.309, 3.385 (2016).

2. The criteria for an initial 40 percent rating prior to April 16, 2014 for radiculopathy of the left lower extremity have been met. 38 U.S.C.A. §1155, 5103, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.321, 4.1, 4.2, 4.3, 4.6, 4.7, 4.10, 4.124a, Diagnostic Code (DC) 8520 (2016).

3. The criteria for a rating in excess of 20 percent as of April 16, 2014 for radiculopathy of the left lower extremity have not been met. 38 U.S.C.A. §1155, 5103, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.321, 4.1, 4.2, 4.3, 4.6, 4.7, 4.10, 4.124a, Diagnostic Code (DC) 8520 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

Upon receipt of a substantially complete application, VA must notify the claimant and any representative of any information, medical evidence, or lay evidence not previously provided to VA that is necessary to substantiate the claim. The notice must: (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5103, 5103A, 5107 (West 2014); 38 C.F.R. § 3.159 (2016); Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

The Board notes that the Veteran was provided a 38 U.S.C.A. § 5103(a)-compliant notice in May 2010, prior to the initial adverse decision in this case, and additional 38 U.S.C.A. § 5103(a)-compliant notices in January and April 2014. The notices additionally provided information regarding establishing effective dates. Thereafter, the claims were readjudicated in a September 2015 supplemental statement of the case (SSOC). Thus, VA has satisfied its duty to notify the appellant and had satisfied that duty prior to the adjudication in the most recent September 2015 SSOC. 

The Board also finds the duty to assist requirements have been fulfilled. The Veteran was provided with two VA examinations with regard to his residuals of ruptured eardrums claim on appeal, both of which occurred in September 2010. The Veteran was additionally provided VA examinations with regard to his LLE radiculopathy increased rating claim on appeal that occurred in September 2010, April 2014 and January 2015. The Board has reviewed the examination reports and finds they are adequate to adjudicate the claims on appeal. Additionally, all relevant, identified, and available evidence has been obtained, and VA has notified the appellant of any evidence that could not be obtained. The appellant has not referred to any additional, unobtained, relevant, available evidence. 

Thus, the Board finds that VA has satisfied the duty to assist provisions of law. No further notice or assistance to the Veteran is required to fulfill VA's duty to assist in development. Smith v. Gober, 14 Vet. App. 227 (2000); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); Quartuccio v. Principi, 16 Vet. App. 183 (2002).

Service Connection

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated during service. 38 U.S.C.A. § 1110 (West 2014); 38 C.F.R. § 3.303 (2016). In order to establish entitlement to service connection, there must be (1) evidence of a current disability; (2) medical, or in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) a causal connection between the claimed in-service disease or injury and the current disability. Shedden v. Principi, 381 F.3d 1163 (Fed. Cir. 2004).

Service connection may be presumed for certain chronic diseases which develop to a compensable degree within one year after discharge from service, even though there is no evidence of the disease during the period of service. That presumption is rebuttable by probative evidence to the contrary. 38 U.S.C.A. §§ 1101, 1112, 1113 (West 2014); 38 C.F.R. 3.307, 3.309(a) (2016). 

Lay evidence presented by a Veteran concerning continuity of symptoms after service may not be deemed to lack credibility solely because of a lack of contemporaneous medical evidence. Buchanan v. Nicholson, 451 F.3d 1331 (2006). The Board has the authority to discount the weight and probity of evidence in light of its own inherent characteristics and its relationship to other evidence. Madden v. Gober, 125 F.3d 1477 (Fed. Cir. 1997). 

The Board must assess the credibility and weight of all the evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Masors v. Derwinski, 2 Vet. App. 181 (1992); Wilson v. Derwinski, 2 Vet. App. 614 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164 (1991); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Equal weight is not accorded to each piece of evidence contained in the record; every item of evidence does not have the same probative value.

The Board must determine whether the evidence supports the claim or is in relative equipoise, with the appellant prevailing in either case, or whether the preponderance of the evidence is against the claim, in which case, service connection must be denied. Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

Residuals of Ruptured Eardrums

The Veteran asserts service connection for residuals of ruptured eardrums. Specifically, the Veteran asserts residuals from a bilateral myringotomy procedure he underwent in service resulted in scarring of his eardrums which he asserts contributed to his bilateral hearing loss. Based on a review of the record, the Board finds that service connection for residuals of ruptured eardrums, including bilateral hearing loss, is not warranted.

1. Factual Background

The Veteran's service treatment records (STRs) include an August 1972 enlistment examination noting normal ears and eardrums. An audiological examination was not conducted. Whisper test results were 15/15 bilaterally and the examining physician noted hearing within normal limits. Additionally, the Veteran denied any ear trouble or hearing loss. A September 1973 Naval Hospital STR shows a preliminary diagnosis for acute bilateral otitis media. The Veteran had a fever and complained of bilateral ear pain. In October 1973, the Veteran underwent a bilateral myringotomy at a Naval Hospital to treat a diagnosed bilateral serous otitis media (SOM) that had not resolved. An August 1974 Naval Hospital ear, nose and throat (ENT) record noted that the Veteran's bilateral SOM had resolved. Lastly, a November 1974 separation examination noted normal ears and eardrums and a whisper test results were 15/15 bilaterally. Additionally, an audiological examination revealed the following audiometric testing results:




HERTZ



500
1000
2000
3000
4000
RIGHT
0
0
0
0
0
LEFT
0
0
0
0
0

Following separation from the Navy, the Veteran served in the Reserves. Reserve era STRs include a June 1976 examination noting normal ears and eardrums and the Veteran denied any hearing loss. A whisper test revealed 15/15 testing results bilaterally. The Veteran did report ear trouble and the examining physician noted a prior procedure for pressure equalization of the middle ear. A March 1988 examination noted normal ears and eardrums and the Veteran denied any ear trouble or hearing loss. No audiological examination was conducted. A February 1989 examination noted normal ears and eardrums and the Veteran denied any ear trouble or hearing loss. Again, no audiological examination was conducted.

An April 2009 VA audiology record noted that tympanic membranes were found clear and intact bilaterally via an otoscopy. The audiologist noted hearing within normal limits through 2,000 Hz and dropping to a moderately severe to profound sensorineural hearing loss bilaterally. No audiometric testing results are included in the record.

The Veteran underwent a VA examination in September 2010. An audiological examination revealed the following testing results:




HERTZ



500
1000
2000
3000
4000
RIGHT
10
20
25
60
75
LEFT
5
15
20
60
70

Speech recognition scores were 88 percent for the right ear and 86 percent for the left ear. The Veteran was diagnosed with bilateral high frequency sensorineural hearing loss. Reported service related acoustic trauma included naval guns. Post-service occupational noise exposure included working as a welder for twelve years and a truck driver for twenty-two years. Recreational noise exposure was minimal. The Veteran reported first noticing bilateral hearing loss in 1972/1973 which he asserted resulted in a myringotomy procedure. He further reported not seeking a hearing evaluation for thirty-five years after separation from service and denied any tinnitus. However, the Veteran reported having problems understanding spoken words, especially in crowds, ever since leaving service. The Veteran further reported that doctors had commented on scar tissue in his eardrums whenever his ears were examined. The examiner noted that the Veteran underwent a bilateral myringotomy sometime in 1973 to relieve the plugged feeling in both ears and hearing impairment. Upon examination, the Veteran's bilateral eardrum and middle ear function was found normal and an otoscopy showed tympanic membranes intact. Immittance results were found consistent with normal middle ear function bilaterally, and contralateral, acoustic, and reflex decay results were noted as consistent with normal nerve function. 

The examiner opined that the Veteran's claimed bilateral ear drum residuals "was not caused by or a result of his history of military noise exposure or myringotomies." The examiner stated that there was no indication that the Veteran underwent myringotomies in service. Despite that finding, the examiner found that, even if the Veteran underwent myringotomies it only had a temporary effect on his hearing sensitivity. The examiner noted that myringotomies are performed to improve Eustachian tube function and to improve bilateral hearing sensitivity, and that the evidence of record, including the separation examination, noted normal bilateral hearing sensitivity. The examiner further noted that the separation examination noted normal eardrums. Lastly, the examiner noted that an otoscopy showed tympanic membranes intact bilaterally and immittance results were consistent with normal middle ear function. Thus, the examiner found that any myringotomy procedure in service caused no permanent effect on the Veteran's bilateral hearing sensitivity. The examiner further found that the present hearing loss was caused by, and a result of, his extensive history of occupational noise exposure and that such noise exposure accounted for his present degree of bilateral hearing loss.

In a separate September 2010 VA examination report, the examiner found no auricle deformity or loss of tissue. The ear canals were found wide open, clean with no evidence of infection or cerumen. The tympanic membranes upon examination were found transparent, intact with normal landmarks and no evidence of scarring or thickening. Based on a review of the hearing test evaluation in the claims file, the examiner opined that the current hearing loss "most likely came about after leaving the military." The examiner based this opinion on a finding that the VA audiometric report did not show a pattern of acoustic trauma and normal tympanic membranes that showed no signs of scarring or thickening.

In a July 2012 brief, the Veteran's representative asserted that the September 2010 VA examiner did not provide a rationale for his medical opinion. 

During a January 2015 Board video-conference hearing, the Veteran testified that he had his eardrums cut at a Naval Hospital during service. The Veteran further testified that two years prior an examining physician told him that scar tissue attributed to his in-service myringotomy contributed to his hearing loss.

2. Legal Analysis

After a review of all the evidence, the Board finds that service connection for residuals of ruptured eardrums, to include bilateral hearing loss, is not warranted. 

Specific to claims for service connection, impaired hearing is considered a disability for VA purposes when the auditory threshold in any of the frequencies of 500, 1,000, 2,000, 3,000, or 4,000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of these frequencies are 26 or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385 (2016).

The absence of in-service evidence of hearing loss is not fatal to a claim for service connection. Ledford v. Derwinski, 3 Vet. App. 87 (1992). Competent evidence of a current hearing loss disability meeting the requirements of 38 C.F.R. § 3.385, and a medically sound basis for attributing such disability to service, may serve as a basis for a grant of service connection for hearing loss. Hensley v. Brown, 5 Vet. App. 155 (1993).

The Board will first address service connection for residuals of ruptured eardrums other than hearing loss. 

A review of the STRs show the Veteran underwent a bilateral myringotomy in October 1973 to treat SOM. However, an August 1974 Naval Hospital ENT record noted that the Veteran's bilateral SOM had resolved. Additionally, the Veteran's separation examination and all subsequent Reserve examinations noted normal ears and eardrums. Lastly, an April 2009 VA audiology record and the Veteran's September 2010 VA examinations found no ear deformity or loss of tissue, and the tympanic membranes were found transparent, intact and normal with no evidence of scarring or thickening. Additionally, the ear canals were found wide open, clean with no evidence of infection or cerumen and there was no evidence of tenderness or cholesteatoma.

The Board finds that the most probative and credible evidence establishes that the Veteran does not have a diagnosis of residuals from ruptured eardrums. Kahana v. Shinseki, 24 Vet. App. 428, 433 (2011). Specifically, the medical findings of the April 2009 VA physician and both September 2010 examination reports show no evidence of any ear disorder apart from bilateral high frequency hearing loss. As such, the credible and competent evidence does not establish a current diagnosis for which to base a claim for service-connection. 

The Board observes that the existence of a current disability is the cornerstone of a claim for VA disability compensation. Degmetich v. Brown, 104 F. 3d 1328 (Fed. Cir. 1997); Gilpin v. West, 155 F.3d 1353 (Fed. Cir. 1998). In the absence of evidence of a current disability there can be no valid claim. Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see McClain v. Nicholson, 21 Vet. App. 319 (2007) (finding that the requirement for a current disability is satisfied if the claimant has a disability at the time a claim was filed or at any time during the pendency of the appeal, even if the disability resolves prior to the Secretary's adjudication of the claim). The medical evidence of record does not show that the Veteran has had any ear conditions other than bilateral hearing loss during the appeal period. Further, there is no evidence that residuals of ruptured eardrums existed when the claim was filed. See Romanowsky v. Shinseki, 26 Vet. App. 289, 293 (2013). Accordingly, the Veteran's claim for service connection for residuals from ruptured eardrums other than hearing loss must be denied.

The Board will now address the Veteran's claim for bilateral hearing loss.

A review of the STRs do not reveal any complaints of, or treatment for, hearing loss, and the Veteran denied ear trouble or hearing loss on both his entrance and separation examinations. Additionally, hearing examination conducted during service showed normal hearing. As such, there is no competent evidence establishing treatment for, or complaints of, hearing loss during service. The Veteran's Reserve STRs additionally show no findings, complaints or treatment for bilateral hearing loss. Instead, the first competent medical evidence showing audiometric findings meeting threshold requirements of 38 C.F.R. § 3.385 is the September 2010 VA examination, some twenty-six years after service. The Board does note that the April 2009 VA audiology medical record noted hearing within normal limits through 2,000 Hz and dropping to a moderately severe to profound sensorineural hearing loss bilaterally, however, no audiological testing results are included in that record.

As to whether the Veteran's current bilateral hearing loss is related to service, the Board finds both the September 2010 VA examinations the most probative evidence of record. The initial examination report reviewed and discussed the evidence of record as well as the Veteran's lay statements and traumatic noise exposure history. Following that review, and after conducting an audiological examination, the examiner opined that the Veteran's bilateral hearing loss "was not caused by or a result of his history of military noise exposure or myringotomies." The examiner further found that the Veteran's extensive occupational noise exposure history, including working many years as a welder and truck driver, accounted for his present degree of bilateral hearing loss. 

The Board notes that the examiner found no indication that the Veteran underwent a bilateral myringotomy in service despite STRs clearly stating the Veteran had that procedure performed in October 1973. However, the examiner noted the Veteran's in-service diagnosis and treatment for bilateral otitis media and he provided a medical examination and issued an opinion and analysis based on the assumption that the Veteran did undergo a bilateral myringotomy in service. Specifically, the examiner found no current residuals from the in-service bilateral otitis media or the myringotomy procedure. Therefore, given the examiner's detailed analysis and findings based on the assumption that a myringotomy was performed during service as asserted by the Veteran, the Board finds harmless error in the examiner's finding that the STRs did not document the procedure.

Additionally, the second September 2010 examination report included findings of no scarring or thickening of the tympanic membranes which were found normal. Thus, neither examination was able to find any residuals from the bilateral myringotomy which the Veteran asserted caused or contributed to his bilateral hearing loss. Moreover, the Board finds similar etiological findings by two separate VA examiners to be of substantial probative value.

The Board recognizes the Veteran's assertion that his in-service myringotomies caused or contributed to his bilateral hearing loss. However, as noted above, no residual from the myringotomies, such as scar tissue, were found. Moreover, the examiner explained that a myringotomy is performed to improve Eustachian tube function and to improve bilateral hearing sensitivity. There simply is no evidence showing abnormal bilateral hearing sensitivity in service following the 1973 procedure, or in the Reserve era STRs following service. 

The Board also recognizes the Veteran's assertion that he first noticed bilateral hearing loss in 1973/1973, and that he had problems understanding spoken words ever since leaving service; thus, asserting a continuity of symptomatology. The Veteran is considered competent to report the observable manifestations of his claimed disability. See Charles v. Principi, 16 Vet. App. 370, 374 (2002) ("ringing in the ears is capable of lay observation"); Layno v. Brown, 6 Vet. App. 465, 469-70 (1994) (lay testimony iterating knowledge and personal observations of witness are competent to prove that claimant exhibited certain symptoms at particular time following service). In this regard, while the Veteran can competently report the onset and continuity of hearing loss symptoms, an actual diagnosis of sensorineural hearing loss requires objective testing to determine whether it is severe enough to be considered a disability for VA compensation purposes, and can have many causes. See Jandreau v. Nicholson, 492 F.3d 1372, 1376, 1377 (Fed. Cir. 2007) (noting general competence to testify as to symptoms but not to provide medical diagnosis).

In any event, to the extent the Veteran may be competent to opine as to medical etiology, the Board finds that the Veteran's lay assertions in the present case are outweighed by the medical evidence of record including the September 2010 VA examination reports. The examiners have training, knowledge, and expertise on which they relied to form their opinions, and they provided persuasive rationales for them. There is no medical evidence to the contrary.

Lastly, the Board recognizes assertions made by the Veteran's representative that the VA examiner provided no rationale for his medical opinion. Initially, the Board notes that the representative did not identify which VA examination he found inadequate. Regardless, the Board finds this assertion without merit as the first September 2010 VA examination report provided a detailed rationale including a detailed review of the medical history, a review of medical literature regarding hazardous noise exposure, and an overview of myringotomy medical procedures. The second examination report provided an additional finding that the tympanic membranes showed no evidence of scarring or thickening and based his opinion on the audiological record and examination of the bilateral ears.

Thus, after reviewing the evidence of record the Board finds there is no causal connection between the current bilateral hearing loss disability and service. Although the Veteran is entitled to the benefit of the doubt where the evidence is in approximate balance, the benefit of the doubt doctrine is inapplicable where, as here, the preponderance of the evidence is against the claim for service connection for bilateral hearing loss. The claim is denied. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2016); Gilbert v. Derwinski, 1 Vet. App. 49, 58 (1990).

Increased Ratings

Disability ratings are determined by applying the criteria set forth in VA's Schedule for Rating Disabilities, which is based on the average impairment of earning capacity. Individual disabilities are assigned separate diagnostic codes. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2016). The basis of disability ratings is the ability of the body as a whole, or of the psyche, or of a system or organ of the body, to function under the ordinary conditions of daily life, including employment. 38 C.F.R. § 4.10 (2016).

Where there is a question as to which of two ratings shall be applied, the higher rating will be assigned if the disability more closely approximates the criteria required for that particular rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016). When a reasonable doubt arises regarding the degree of disability, that reasonable doubt will be resolved in favor of the Veteran. 38 C.F.R. § 4.3 (2016).

In determining the severity of a disability, the Board is required to consider the potential application of various other provisions of the regulations governing VA benefits, whether or not they were raised by the Veteran, and the entire history of the Veteran's disability. 38 C.F.R. §§ 4.1, 4.2 (2016); Schafrath v. Derwinski, 1 Vet. App. 589 (1991).

Staged ratings are appropriate for an increase rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). Where there is a question as to which of two ratings shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016).

When rating musculoskeletal disabilities on the basis of limited motion of a joint, VA must consider functional loss due to limited or excess movement, pain, weakness, excess fatigability, or incoordination. 38 C.F.R. §§ 4.40, 4.45 (2016); DeLuca v. Brown, 8 Vet. App. 202 (1995). The provisions of 38 C.F.R. § 4.40 and 38 C.F.R. § 4.45 are to be considered only in conjunction with diagnostic codes predicated on limitation of motion. Johnson v. Brown, 9 Vet. App. 7 (1996). 

Painful motion is an important factor of joint disability and actually painful joints are entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59 (2016). Where functional loss is alleged due to pain upon motion, the function of the musculoskeletal system and movements of joints must still be analyzed. DeLuca v. Brown, 8 Vet. App. 202 (1995). A finding of functional loss due to pain must be supported by adequate pathology, and evidenced by the visible behavior of the claimant. Johnston v. Brown, 10 Vet. App. 80 (1997). Similarly, painful motion alone does not constitute limited motion for the purposes of rating under diagnostic codes pertaining to limitation of motion. However, pain may result in functional loss if it limits the ability to perform normal movements with normal excursion, strength, speed, coordination, or endurance. Functional loss due to pain is to be rated at the same level as functional loss caused by some other factor that actually limited motion. Mitchell v. Shinseki, 25 Vet. App. 32 (2011).

The regulations preclude the assignment of separate ratings for the same manifestations under different diagnoses. The critical element is that none of the symptomatology for any of the conditions is duplicative of or overlapping with symptomatology of the other conditions. 38 C.F.R. § 4.14 (2016); Esteban v. Brown, 6 Vet. App. 259 (1995).

Radiculopathy of the Left Lower Extremity with Diabetic Neuropathy

A May 2013 rating decision granted service connection for LLE radiculopathy and assigned an initial 10 percent disability rating from March 31, 2010, pursuant to 38 C.F.R. § 4.124a, DC 8520. A May 2014 rating decision granted an increased rating of 20 percent effective April 16, 2014.

After a review of the evidence, the Board finds that an initial rating of 40 percent, but not higher, is warranted prior to April 16, 2014 for the service-connected LLE radiculopathy. The Board further finds that, as of April 16, 2014, the preponderance of the evidence is against the assignment of a rating in excess of 20 percent. 

In March 2010, the Veteran underwent left L3-L4 hemilaminectomies with L3-L4 partial discectomy and the Veteran filed his claim for service connection two weeks later. The Veteran underwent a VA examination in September 2010. The Veteran reported that his left leg hit the ground differently and did not feel right. The Veteran also reported radiating pain that felt like pins and needles. The examiner noted numbness, paresthesia, leg and/or foot weakness, and unsteadiness. A reflex examination was normal for the bilateral lower extremities except for a knee jerk which was found hypoactive bilaterally. A sensory examination of the LLE noted the following: decreased vibration in the knee, medial and lateral malleolus and great toe; normal position sense; decreased pain or pinprick in the plantar and dorsal surface forefoot and toes; decreased light tough to the plantar and dorsal surface forefoot and toes; decreased monofilament sensory function of the plantar and dorsal surface forefoot and toes; and no dysesthesias. A bilateral lower extremity motor examination was normal except for active movement against some resistance which was found for the left ankle plantar flexion and ankle dorsiflexion. No muscle atrophy was found. The Veteran used a cane and walker for ambulation.

A July 2011 VA medical record shows an examination of the LLE revealing weakness of the left ankle dorsiflexion, plantar flexion, and eversion and left extensor halluces longus muscle. The examination also revealed muscle weakness in the left gluteus medius, hip abductor muscles and hip extensors. No muscle atrophy was found. A neurological examination revealed decreased sensation to light touch and pinprick in the left L4-L5-S1 nerve distribution. In September 2011, the Veteran reported pain radiating to his left buttock area and posterior aspect of the left thigh and down the lateral aspect of his left lower leg and dorsum of the left foot. He further described mostly numbness and tingling sensation of all toes, especially the big toe. In September 2012, the Veteran complained of increased pain and profound weakness in his lower extremities. The Veteran described his condition as being "paralyzed" and reported being paralyzed for about one-half hour in both lower extremities. He was diagnosed with lower extremity weakness. 

In October 2012, the Veteran complained of severe leg pain that had gotten worse over the past month. The Veteran further reported that his pain medication had not worked and he rated his pain at 10 on a scale to 10. The Veteran underwent a L4-L5 fusion for lower back pain with radiculopathy in November 2012 and the RO granted a 100 percent convalescence rating from November 23, 2012 to January 1, 2013. A May 2013 VA rehabilitation medical record noted that the Veteran presented with no radiculopathy pain, although he reported that his legs felt like rubber. The Veteran further reported falling on two occasions since the surgery due to his left leg "not being there." The physician found limited strength and endurance with functional tasks. A November 2013 VA psychotherapy medical record noted that the Veteran canceled his recent appointment due to having a lot of pain in his legs. The Veteran stated that he could not get out of bed at times and was awaiting a transcutaneous electrical nerve stimulation (TENS) unit to deal with the pain in his legs.

During an April 16, 2014 VA examination, the Veteran's LLE radiculopathy was manifested by severe intermittent pain (usually dull), moderate paresthesia and/or dysesthesias and numbness. The radiculopathy involved the L4/L5/S1/S2/S3 sciatic nerve roots. The overall severity of the LLE radiculopathy was found to be moderate. The Veteran was not found to have muscle atrophy and his LLE muscle strength was found normal for his hip, knee, ankle and great toe extension. Reflexes were also noted as normal. A sensory examination noted decreased LLE sensation to light touch while testing the leg, ankle, foot and toes. No other signs or symptoms of radiculopathy were found. The Veteran used a cane as a regular mode of locomotion and reportedly had another fall the following week.

During a January 2015 Board video-conference hearing, the Veteran testified that his current symptoms included pain down the side of his leg described as knife and needle like running into his feet and toes. Symptoms were reportedly caused by physical activities, mainly if the Veteran moved around too much. The Veteran further testified that symptoms were treated with heat, muscle relaxer medication and relaxation. Additionally, the Veteran testified that he did not put a lot of weight on his left leg as it did not feel as supportive as his right leg. Flare-ups were reported twice per month with "real bad episodes" causing the Veteran to fall. Standing for prolonged periods of time also reportedly caused problems as did walking and navigating stairs. Specifically, the Veteran reported that his left leg and buttock felt heavy while walking, although he reported being able to lift his left leg while walking. The Veteran further reported waking numerous times during the night in order to roll himself over.

At a January 2015 VA examination, the Veteran's service-connected LLE radiculopathy was manifested by normal muscle strength, moderate intermittent pain (usually dull) and mild numbness. No constant pain, or paresthesia and/or dysesthesias were found. Additionally, the examiner noted decreased LLE sensation to light touch. Reflexes were noted as hypoactive bilaterally and no other neurologic abnormalities were found. Additionally, no muscle atrophy was found and the Veteran used a cane for ambulation. Overall, the examiner indicated the severity of the Veteran's LLE radiculopathy was moderate. 

In June 2015 the Veteran had a spinal cord stimulator implanted to treat his lower back and leg pain. Follow-up medical records show that the Veteran reported a 50 percent relief in his symptoms. Pain was reported at 4.5 on a scale to ten. Muscle tone was found normal and the Veteran's gait was noted as non-antalgic and unassisted. Additionally, deep tendon reflexes in the bilateral lower extremity was normal as well as sensation with vibratory sensation noted as intact. Another June 2015 private treatment record noted pain reported at 5 on a scale to 10 and described with the following adjectives: dull, aching, throbbing, cramping, sharp, burning, shooting, stabbing and tingling. The pain was alleviated by heat, massage and medication. The Veteran reported that his overall function had improved with treatments including the spinal cord stimulator. 

Diagnostic Codes 8520-8730 address ratings for paralysis of the peripheral nerves affecting the lower extremities, neuritis, and neuralgia. 38 C.F.R. § 4.124a, Diagnostic Codes 8520-8730 (2016). Diagnostic Codes 8520, 8620, and 8720 provide ratings for paralysis, neuritis, and neuralgia of the sciatic nerve. 38 C.F.R. § 4.124a (2016). Disability ratings of 10, 20, and 40 percent are warranted, respectively, for mild, moderate, and moderately severe incomplete paralysis of the sciatic nerve. 38 C.F.R. § 4.124a, DC 8520 (2016). A disability rating of 60 percent is warranted for severe incomplete paralysis with marked muscle atrophy. An 80 percent rating is warranted with complete paralysis of the sciatic nerve. Id. 

The term "incomplete paralysis," with respect to peripheral nerve injuries, indicates a degree of lost or impaired function substantially less than the type pictured for complete paralysis given with each nerve, whether due to varied level of the lesion or to partial regeneration. Where the involvement is wholly sensory, the rating should be for mild, or at the most, moderate symptomatology. 38 C.F.R. § 4.124a (2016).

The Board will first address the Veteran's initial 10 percent rating prior to April 16, 2014. 

The Board finds that the weight of the entire evidentiary record during this period on appeal supports a finding of moderately severe symptomatology. Specifically, the Board finds that the September 2010 VA examiner's findings of paresthesia, LLE weakness and unsteadiness indicate symptomology not wholly sensory in nature. The record further shows findings of muscle weakness and unsteadiness up to and following the Veteran's November 2012 L4-L5 fusion and laminectomy to treat his lower back pain with radiculopathy. The record additionally shows that the Veteran was not assessed with normal muscle strength until the April 16, 2014 VA examination which also noted normal reflexes and LLE radiculopathy moderate in overall severity. In essence, a comparison of the September 2010 and April 2014 VA examination reports shows similar findings. However, the Board finds the September 2010 VA examiner's additional finding of LLE muscle weakness, which is supported by contemporaneous medical records, supports a higher evaluation of moderately severe symptomatology.

Accordingly, prior to April 16, 2014, the Board finds that an initial rating of 40 percent is warranted. A higher rating is not warranted during this period on appeal as there is no evidence of marked muscular atrophy, the evidence does not demonstrate complete paralysis of the affected nerve, and the weight of the competent and credible evidence does not establish foot drop on the left. 

The Board will now address the period on appeal as of April 16, 2014.

The Board finds the April 2014 VA examination to have great evidentiary weight as the examination reflects a comprehensive review of the entire evidentiary record including diagnostic testing related to the service-connected LLE radiculopathy. The VA examiner concluded that the service-connected LLE radiculopathy was productive of moderate impairment and that finding is based on sufficient facts and data. Moreover, following the November 2012 L4-L5 fusion and laminectomy to treat the Veteran's lower back pain with radiculopathy, the April 2014 examination is the first record showing complete testing of the LLE hip, knee, ankle and great toe extension; all noting normal muscle strength. 

Factors for assessing the probative value of a medical opinion are the examiner's access to the claims file and the thoroughness and detail of the opinion. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998). In Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008), the Court held that guiding factors in evaluating the probity of a medical opinion are whether the opinion was based on sufficient facts or data, whether the opinion was the product of reliable principles and methods, and whether the medical professional applied the principles and methods reliably to the facts of the case. The VA examiner has the skill and medical expertise to provide a medical opinion as to the severity of the Veteran's LLE radiculopathy. See Black v. Brown, 10 Vet. App. 279, 284 (1997). As such, the Board finds the April 2014 VA medical opinion to have great probative weight.

The Board also notes that the April 2014 VA examiner's findings are supported by post-operative private medical records following the November 2012 surgery including January, February, May and October 2013 findings of normal motor strength. However, as noted above, no comprehensive testing of the various LLE muscles is included in those reports. Moreover, a January 2015 VA examination additionally found normal muscle strength, moderate intermittent pain (usually dull) and mild numbness. No constant pain, paresthesia and/or dysesthesias were found. Overall, the examiner indicated the severity of the Veteran's LLE radiculopathy was moderate. Lastly, the Board notes that the Veteran was treated with a spinal cord stimulator in June 2015 to treat his symptoms of low back and leg pain. During a follow-up visit the Veteran reported a 50 percent relief in his symptoms. Additionally, the Veteran's muscle tone was found normal and his gait was noted as non-antalgic and unassisted. 

Accordingly, the Board finds that the weight of the evidence shows that, as of April 16, 2014, the Veteran's service-connected LLE radiculopathy has been productive of no more than moderate impairment. The evidence shows that the Veteran's LLE radiculopathy involvement was wholly sensory as it was manifested by pain, decreased sensation and numbness. The evidence does not demonstrate complete paralysis of the affected nerve and the evidence does not establish foot drop on the left. As such, the Board concludes that the weight of the evidence supports no more than the 20 percent rating that is currently assigned for the service-connected LLE radiculopathy during this period on appeal. 

In sum, the Board concludes that a 40 percent disability rating is warranted prior to April 16, 2014 for LLE radiculopathy, and that claim is granted. Additionally, the Board concludes that a preponderance of the evidence is against the assignment of a disability rating in excess of 20 percent as of April 16, 2014. As the preponderance of the evidence is against that portion of the claim, the benefit of the doubt doctrine does not apply, and the claim must be denied. 38 U.S.C.A. § 5107 (b) (West 2014); 38 C.F.R. § 3.102 (2016); Gilbert v. Derwinski, 1 Vet. App. 49, 58 (1990).

Extraschedular Consideration

The question of an extra-schedular rating is a component of a claim for an increased rating. See Bagwell v. Brown, 9 Vet. App. 337, 339 (1996). Although the Board may not assign an extra-schedular rating in the first instance, it must specifically adjudicate whether to refer a case for extra-schedular evaluation when the issue either is raised by the claimant or reasonably raised by the evidence of record. Barringer v. Peake, 22 Vet. App. 242 (2008).

The Court has clarified the analytical steps necessary to determine whether referral for extra-schedular consideration is warranted. See Thun v. Peake, 22 Vet. App. 111 (2008), aff'd sub. nom. Thun v. Shinseki, 573 F.3d 1366 (Fed Cir. 2009). First, there must be a determination of whether the evidence presents such an exceptional disability picture that the available schedular evaluation for that service-connected disability is inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, there must be a determination of whether the Veteran's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extra-schedular rating under 38 C.F.R. § 3.321(b)(1).

The Board finds that referral for extraschedular consideration is not warranted. The evidence of record shows that, throughout the period on appeal, the Veteran's service-connected LLE radiculopathy was adequately contemplated by the regular schedule rating criteria. An evaluation in excess of those assigned is provided for certain manifestations of the Veteran's service-connected LLE radiculopathy, but the medical evidence reflects that those manifestations were not present in this case. Additionally, the diagnostic criteria adequately describe the severity and symptomatology of the Veteran's disability. The primary symptoms of the Veteran's LLE radiculopathy are pain, decreased sensation to light touch, and numbness and tingling sensations. The Veteran is currently rated under 38 C.F.R. § 4.124a, DC 8520, based upon those symptoms.

Consequently, the Board finds that referral for extraschedular consideration is not required. The schedular rating criteria also provide for higher ratings for more severe symptomatology, which are not shown. Therefore, there is no need to consider the downstream consideration of whether there is marked interference with the Veteran's employment or frequent hospitalizations. 38 C.F.R. § 3.321(b)(1) (2016); Bagwell v. Brown, 9 Vet. App. 337 (1996); Floyd v. Brown, 9 Vet. App. 88 (1996); Shipwash v. Brown, 8 Vet. App. 218 (1995). 

Finally, the Board notes that a September 2015 rating decision granted a total disability rating due to individual unemployability, effective December 29, 2014. The record does not reflect that the Veteran disagreed with the effective date as no notice of disagreement was filed within one year of the rating decision. Accordingly, no further action is required concerning TDIU. See Rice v. Shinseki, 22 Vet. App. 447 (2009).


ORDER

Entitlement to service connection for residuals of ruptured eardrums, to include bilateral hearing loss, is denied.

Entitlement to an initial 40 percent disability rating, but not higher, prior to April 16, 2014 for LLE radiculopathy is granted.

Entitlement to a rating in excess of 20 percent as of April 16, 2014 for LLE radiculopathy is denied.




____________________________________________
Thomas H. O'Shay
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs