**Michael SHIPWASH, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 94–0021.**

United States Court of Veterans Appeals.

May 10, 1995.

As Amended Nov. 6, 1995.

N. Albert Bacharach, Jr., Gainesville, FL, was on the brief for appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; Adrienne Koerber, Deputy Assistant General Counsel; and John C. Winkfield were on the brief for appellee.

Before MANKIN, HOLDAWAY, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, veteran Michael S. Shipwash, appeals a September 20, 1993, decision of the Board of Veterans' Appeals (BVA or Board) denying an increased rating for residuals of an injury to the right little finger. Record (R.) at 5. Both parties filed briefs. For the reasons that follow, the Court will affirm in part and vacate in part the decision of the Board and remand a matter for readjudication consistent with this opinion.

## I. Background

The veteran served on active duty in the U.S. Army from November 1988 to October 1991. R. at 15. His July 1988 entrance medical examination report indicated "normal" for "upper extremities". R. at 19. A January 1990 Service Medical Record (SMR) indicated that the veteran was to have two weeks of sick leave following recent surgery on the right hand. R. at 61. April 1990 SMRs indicate that the veteran, while stationed in Germany, had fallen from a bicycle and sprained his right wrist. R. at 66, 69. An x-ray of the wrist was negative for any obvious fracture. R. at 65–66. In June 1990, he fell and fractured his left wrist, and received outpatient treatment and therapy until October 1990. R. at 71–73, 91, 97.

In November 1990, while still stationed in Germany, the veteran fractured his right little finger when his hand was caught between a truck and a loading ramp. 108–09. He had surgery to reduce the fracture on November 24, 1990. R. at 108. A January 1991 SMR reported that he could not "bend or straighten his right little finger [and] continues to have physical therapy without any relief". R. at 117. A February 1, 1991, orthopedic consultation report indicated "virtually no motion at PIP joint" ("PIP joint" is an abbreviation of "proximal interphalangeal

joint", which refers to the first finger joint past the knuckle, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 846, 1270, 1375 (27th ed. 1988) [hereinafter DORLAND'S] ), and noted that a "pin appears to be blocking joint flexion". R. at 119. A surgical procedure was performed on February 6, 1991, in an attempt to improve movement in the veteran's finger, but the plate and pins in the finger could not be removed because of incomplete healing of the fracture. R. at 121, 123. The plate was removed from the finger in an operation in June 1991. R. at 140. A September 1991 SMR indicated that he had flexion contracture of the right little finger because of delayed healing of the fracture and protrusion into the finger joint of a pin that had been holding the plate in place. R. at 154–55.

In October 1991, the veteran filed with a Department of Veterans Affairs (VA) regional office (RO) an application for compensation or pension for, inter alia, "laceration of right small finger". R. at 158–61. A December 1991 VARO decision awarded service connection for laceration and fracture of the right little finger, rated 0% disabling, pursuant to 38 C.F.R. § 4.71a, Diagnostic Code (DC) 5227 (1994). R. at 163. The RO decision also granted service connection for a back condition, rated 0% disabling, and stated that it had considered 38 C.F.R. § 3.324 (1994), but did not feel that a combined 10% rating was indicated. The veteran filed a February 1992 Notice of Disagreement and June 1992 VA Form 1–9, Appeal to the BVA. R. at 169, 184.

On August 24, 1992, the veteran testified under oath at a hearing that his finger was fixed in a position of 90–degree flexion and that his "doctors told [him] it would never straighten again". R. at 190. He stated that he would be at a disadvantage in his future career because shaking hands was awkward and he could no longer type 70 words per minute; that he was affected in his ability to participate in sports; that the finger was constantly sore and that when "it comes in contact with something the pain is intense"; that the deformity was embarrassing and "bothers me psychologically"; and that he could not make a fist. R. at 191–92. He

asserted that movement in the middle joint of the finger was impossible, and stated: "I don't even consider it a finger because I can't use it." R. at 192. The hearing officer, in an August 24, 1992, decision, affirmed the 0% rating because "there is no involvement of the metacarpophalangeal joint and motion is possible to within two inches of the transverse fold of the palm" and ankylosis was thus "favorable". R. at 196. (The "metacarpophalangeal joint" is the knuckle, DORLAND'S at 1014, 1270. "Ankylosis" is immobility and consolidation of a joint due to disease, injury, or surgical procedure, DORLAND'S at 91.)

On March 22, 1993, the Board remanded the veteran's claim to the RO for a VA examination to determine the nature and extent of his right-little-finger disability, including scars and the cause of any pain. R. at 214–15. The veteran received an April 1993 examination which diagnosed the scars as "not significantly tender upon palpation." R. at 221. An orthopedic examination that same month recorded that he had "fairly good strength in grasping objects and picking up heavy things, but ... markedly decreased dexterity secondary to the position of his finger"; that when he flexed his fingers down into his palm the tip of the right little finger was approximately one inch away from the median transverse volar of the palm; that the PIP joint was immobile and the DIP joint had "only 10 [degrees of] passive r[ange] o[f] m[otion]"; and that the veteran had reported to the physician that he had lost one job because of his finger injury. R. at 222–23. (The "volar" is the flexor surface of the forearm, wrist, or hand, DORLAND'S at 1847. "DIP joint" is an abbreviation for "distal interphalangeal joint", which is the finger joint farthest from the knuckle, DORLAND'S at 499, 846, 1270.) The orthopedic diagnosis was "[r]ight 5th finger PIP joint contracture secondary to the patient's open proximal phalanx fracture which was suffered in 1990." R. at 223. A VA x-ray examination report stated: "Flexed position of the fifth finger, *associated with some lateral deviation at the level of the metacarpophalangeal joint.*" R. at 224 (emphasis added). Neither examination report dealt with the cause of the veteran's asserted pain.

In June 1993, the RO denied an increased rating for residuals of a right-little-finger fracture, stating that schedular requirements for a compensable (greater than 0%) rating were not met and that the RO had considered and rejected the application of an extraschedular rating under 38 C.F.R. § 3.321(b)(1) (1994). R. at 227–29. The veteran responded with a letter in which he stated that he could not throw a football, use a typewriter efficiently, run his hand through his hair, or put his hand in his pocket, and that "I have even lost a job because of this disability." R. at 238.

The Board, in the September 20, 1993, decision here on appeal, denied an increased rating for residuals of an injury to the veteran's right little finger. The Board stated that the ankylosis of that finger was properly rated as 0% because it was "favorable" under DC 5227, and that a 10% rating for superficial scars was not warranted under DCs 7803 and 7804. R. at 5, 7–8.

## II. Analysis

### A. Generally Applicable Law

■ Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "A well[-]grounded claim is a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a)]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). In addition, the Court held in *Tirpak v. Derwinski,* 2 Vet.App. 609, 611 (1992) (quoting section 5107(a)), that to be well grounded a claim must be accompanied by supportive evidence and that such evidence "must 'justify a belief by a fair and impartial individual' that the claim is plausible." Where the determinative issue involves either medical etiology or a medical diagnosis, competent medical evidence is required to fulfill the well-grounded-claim requirement of section 5107(a); where the determinative issue does not require medical expertise

(such as the recounting of symptoms), lay testimony may suffice by itself. *See Lathan v. Brown,* 7 Vet.App. 359, 365 (1995) (citing *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993)); *see also Magana v. Brown,* 7 Vet.App. 224, 227 (1994); *Espiritu v. Derwinski,* 2 Vet. App. 492, 494–95 (1992).

■ The truthfulness of evidence is presumed in determining whether a claim is well grounded. *See Robinette v. Brown,* 8 Vet. App. 69, 75–76 (1995); *King v. Brown,* 5 Vet.App. 19, 21 (1993). The threshold of plausibility to make a claim well grounded is considerably lower than the threshold for new and material evidence to justify reopening a claim. *See Lathan, supra* (citing *Robinette, supra* ). A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grivois v. Brown,* 6 Vet.App. 136, 139 (1994); *Grottveit, supra.*

■ Pursuant to 38 U.S.C. § 5107(a), once a claimant has submitted a well-grounded claim, the Secretary is required to assist that claimant in developing the facts pertinent to the claim. *See* 38 C.F.R. § 3.159 (1994); *Littke v. Derwinski,* 1 Vet.App. 90, 91–92 (1990). Where the record does not adequately reveal the current state of a veteran's disability and the claim is well grounded, the fulfillment of the statutory duty to assist requires a thorough and contemporaneous medical examination. *See Suttmann v. Brown,* 5 Vet.App. 127, 138 (1993); *Green (Victor) v. Derwinski,* 1 Vet.App. 121, 124 (1991). "If a diagnosis is not supported by the findings on the examination report or if the report does not contain sufficient detail, it is incumbent upon the rating board to return the report as inadequate for evaluation purposes." 38 C.F.R. § 4.2 (1994); *see also Schafrath v. Derwinski,* 1 Vet.App. 589, 595 (1991).

■ The BVA is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to

facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Masors v. Derwinski*, 2 Vet. App. 181, 188 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56–57 (1990). To comply with this requirement, the Board's statement of reasons or bases must account for the evidence which it finds to be persuasive or unpersuasive, analyze the credibility and probative value of all material evidence submitted by or on behalf of a claimant, and provide the reasons for its rejection of any such evidence. *See Gabrielson v. Brown*, 7 Vet. App. 36, 40 (1994); *Abernathy v. Principi*, 3 Vet.App. 461, 465 (1992); *Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Hatlestad v. Derwinski*, 1 Vet.App. 164, 169 (1991); *Gilbert, supra*. Moreover, the Board may not rely on its own unsubstantiated medical conclusions to reject expert medical evidence in the record; rather, the Board may reject a claimant's medical evidence only on the basis of other independent medical evidence. *See Thurber v. Brown*, 5 Vet.App. 119, 122 (1993); *Hatlestad v. Derwinski*, 3 Vet.App. 213, 217 (1992); *Colvin v. Derwinski*, 1 Vet. App. 171, 175 (1991).

Disability ratings are to be based, as far as practicable, "upon the average impairments of earning capacity resulting from such injuries in civil occupations." 38 U.S.C. § 1155; 38 C.F.R. § 4.1 (1994). The determination of the level of disability due to service-connected ankylosis of an individual finger other than the thumb, index, or middle finger is made under 38 C.F.R. § 4.71a, DC 5227 (under the heading "ANKYLOSIS OF INDIVIDUAL FINGERS"), which states that ankylosis of the ring or little finger will be rated at 0%. A "NOTE" following DCs 5224 through 5227 states: "Extremely unfavorable ankylosis will be rated as amputation under [DCs] 5152 through 5156." The diagnostic code for "Little finger, amputation of" (DC 5156) provides for a 20% rating when more than one-half of the metacarpal bone has been resected, and for a 10% rating without metacarpal resection.

The following material [which material is hereinafter referred to as the "Ankylosis Preambles"] appears in the Schedule for Rating Disabilities before DCs 5216 through 5219 ("MULTIPLE FINGERS: UNFAVORABLE AN-KYLOSIS") as well as before DCs 5220 through 5223 ("MULTIPLE FINGERS: FAVORABLE AN-KYLOSIS"):

In classifying the severity of ankylosis and limitation of motion of single digits and combinations of digits the following rules will be observed:

(1) Ankylosis of both the metacarpophalangeal and proximal interphalangeal joints, with either joint in extension or in extreme flexion, will be rated as amputation.

(2) Ankylosis of both the metacarpophalangeal and proximal interphalangeal joints, even though each is individually in favorable position, will be rated as unfavorable ankylosis.

(3) With only one joint of a digit ankylosed or limited in its motion, the determination will be made on the basis of whether *motion* is possible to within 2 inches (5.1 cms.) of the median transverse fold of the palm; when so possible, the rating will be for favorable ankylosis, otherwise unfavorable.

38 C.F.R. § 4.71a (emphasis added). The determination of the level of disability due to scarring is made under 38 C.F.R. § 4.118, DCs 7800 through 7805 (1994). DC 7803 provides for a 10% rating for scars that are "superficial, poorly nourished, with repeated ulceration". DC 7804 provides for a 10% rating for scars that are "superficial, tender and painful on objective demonstration". *See Catalig v. Derwinski*, 3 Vet.App. 116, 117–18 (1992) (BVA correctly denied a 10% rating pursuant to DC 7804 where medical evidence demonstrated that scar was healed and was not tender).

Section 3.321(b)(1) of title 38, Code of Federal Regulations, provides the following as to the exceptional case where schedular ratings are inadequate:

To accord justice ... to the exceptional case where the schedular evaluations are found to be inadequate, the Chief Benefits Director or the Director, Compensation and Pension Service, upon field station submission, is authorized to approve on the basis of the criteria set forth in this paragraph an extra-schedular evaluation commensurate with the average earning capac-

ity impairment due exclusively to the service-connected disability or disabilities. The governing norm in these exceptional cases is: A finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards.

38 C.F.R. § 3.321(b)(1) (1994). In *Fisher (Raymond) v. Principi*, 4 Vet.App. 57, 60 (1993), the Court held that where circumstances are presented that the Director of VA's Compensation and Pension Service might consider exceptional or unusual, the RO must specifically adjudicate the issue of whether referral to the Director is indicated; if the case is not referred in such a situation, the BVA must address the nonreferral on appeal and give an appropriate statement of reasons or bases for its decision on the nonreferral question.

Where an appellant has not been harmed by an error in a Board determination, the error is not prejudicial. *See* 38 U.S.C. § 7261(b) ("In making the determinations under subsection (a) of this section, the Court shall take due account of the rule of prejudicial error"); *Yabut v. Brown*, 6 Vet. App. 79, 83 (1993); *Godwin v. Derwinski*, 1 Vet.App. 419, 427 (1991).

### B. Application of Law to Facts

 *1. Well-grounded claim:* The posture of the case is that the veteran has been awarded service connection for a disability with a 0% rating and has appealed that original rating. The Court has previously held that a claim for an increased rating for a disability is generally well grounded when an appellant indicates that the severity of the disability has increased. *See Proscelle v. Derwinski*, 2 Vet.App. 629, 631–32 (1992). Although the veteran in the instant case does seek an increased rating, this case differs from *Proscelle* because the appellant is appealing the *original* assignment of a disability rating, not pursuing an increased rating after a rating has been initially established by a final VA decision. The initial assignment of a rating following the

award of service connection is part of the original claim. *See West v. Brown*, 7 Vet. App. 329, 332 (1995) (en banc) ("successful claimant has not had his case fully adjudicated until there is a decision as to all essential elements, i.e., status, disability, service connection, rating, and when in question, effective date"). In light of the above, the Court holds that when a claimant is awarded service connection for a disability and subsequently appeals the RO's initial assignment of a rating for that disability the claim continues to be well grounded as long as the rating schedule provides for a higher rating and the claim remains open.

*2. Ankylosis:* Pursuant to the NOTE following DC 5227 regarding individual fingers, disability of the little finger will be rated at 0% unless ankylosis of the finger is "extremely unfavorable", in which case it will be rated as amputation under DC 5156. The veteran argues that his right-little-finger disability should be rated under DC 5156 as amputation of the finger. A 10% rating is provided under DC 5156 for amputation where, as here, the metacarpal bone has not been resected.

As the Court has previously observed: "Neither the format of the code pertaining to finger injuries nor its interpretive notes are a model of clarity." *Hill v. Principi*, 3 Vet. App. 540, 541 (1992). The discussion that follows should illustrate that the rating schedule relating to finger disabilities could benefit greatly from Secretarial review, synthesis, and revision.

 "Extremely unfavorable ankylosis" of a finger is not defined in the rating schedule for the purposes of DCs 5224 through 5227, relating to individual fingers. (A definition of "extremely unfavorable ankylosis" does appear in note (a), *following* DC 5219, but that definition appears to be limited to DCs 5216 through 5219, which come under the heading "MULTIPLE FINGERS: UNFAVORABLE ANKYLOSIS" and all of which (not including the Ankylosis Preambles) are written in terms of more than one finger, *see*, *e.g.*, references to "the fingers", "flexion of tips", and "amputations" of "fingers", in (a), (b), and (c), respectively.) When a term (in this case, "extremely" in "extremely unfavor-

able ankylosis" in the NOTE following DCs 5224 through 5227) is not defined in a statute or regulation, it should be given its ordinary meaning. *See Ardestani v. INS*, 502 U.S. 129, 136, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) ("the legislative purpose is expressed by the ordinary meaning of the words used") (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)); *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning"). "Congress need not enact a dictionary each time it passes a law. That the language at issue here ["extremely"] is not expressly defined in the [statute] does not render ambiguous the plain words used." *Jones (McArthur) and Karnas v. Brown*, 41 F.3d 634, 639 (Fed.Cir.1994); *see also Davis v. Brown*, 7 Vet.App. 298, 301 (1994) (using dictionary definition of "mail"). "Extremely" is the adverbial form of the adjective "extreme", which means "in or to the greatest degree". WEBSTER'S NEW WORLD DICTIONARY 482 (3d ed. 1988). "Extremely" unfavorable ankylosis is thus ankylosis of a greater degree of severity than mere unfavorable ankylosis.

The Ankylosis Preambles (see part II.A. *supra*) establish "rules [to] be observed" in "classifying the severity of ankylosis" of fingers. Although, as noted in part II.A., the identical Ankylosis Preambles precede DCs 5216 through 5219 and DCs 5220 through 5223, both relating to multiple fingers, they do not appear with DCs 5224 through 5227, relating to ankylosis of individual fingers. However, the Ankylosis Preambles state that their definitional rules will be used to classify the severity of ankylosis of "single digits and combinations of digits", and thus the Ankylosis Preambles, by their express terms, do apply to DCs 5224 through 5227 as well. *See Hill, supra.*

Although not defining "extremely unfavorable ankylosis", the Ankylosis Preambles do define "favorable ankylosis", "unfavorable ankylosis", and ankylosis "rated as amputation". "Unfavorable ankylosis" is defined in the Ankylosis Preambles above the definition for "favorable" ankylosis and below the definition for ankylosis "rated as amputation".

■ As stated earlier in this subpart, the NOTE following DCs 5224 through 5227 provides that "extremely unfavorable ankylosis" is to be "rated as amputation" under DCs 5152 through 5156 ("SINGLE FINGER AMPUTATIONS"). The term "rated as amputation" is given different meanings in different parts of the rating schedule (*see, e.g.*, note (a) following DC 5219, discussed above). However, it is clear that the term "extremely unfavorable ankylosis" in the NOTE following DCs 5224 through 5227 is ankylosis which is severe enough to be "rated as amputation" pursuant to the Ankylosis Preambles, because those Preambles explicitly apply to DC 5227 and because "rated as amputation" is the only classification in those Preambles of greater severity than "unfavorable ankylosis".

■ The September 1993 BVA decision stated that the veteran's little-finger ankylosis "does not involve the metacarpophalangeal joint". R. at 7. If, in fact, the ankylosis of the veteran's little finger does not involve the metacarpophalangeal joint, then the ankylosis of his finger cannot be "extremely unfavorable". However, there is no medical evidence of record expressly stating that the metacarpophalangeal joint of the right little finger is not involved. Furthermore, the March 1993 VA x-ray examination report accompanying the VA orthopedic examination stated that the flexion of the little finger was "associated with some lateral deviation at the level of the metacarpophalangeal joint". R. at 224. In its statement of reasons or bases for the September 20, 1993, decision, the Board did not address this aspect of the March 1993 x-ray report; nor did the Board point to any medical evidence stating that the metacarpophalangeal joint was not involved. Thus, the Board's statement that the metacarpophalangeal joint was "not involve[d]" was a medical conclusion by the Board, not one supported in the medical evidence of record. *See Colvin, supra.*

The Board further concluded that the veteran's little-finger ankylosis should be rated as "favorable" because "motion is possible [in that finger] to within approximately 1 inch of

the median transverse fold of the palm". R. at 7. The Ankylosis Preambles provide that when only "one joint of a digit is ankylosed", the determination will be made on the basis of whether "motion is possible to within 2 inches" of the median transverse fold of the palm; when so possible, the rating will be for favorable ankylosis. As noted in the preceding paragraph, the medical evidence of record does not appear to support the Board's conclusion that the metacarpophalangeal joint was "not involve[d]"; however, even if the Board had been correct in concluding on the basis of the available evidence that the metacarpophalangeal joint was not involved, the veteran's little-finger ankylosis still could not be rated as "favorable" because "motion" was not possible to within 2 inches of his palm. The medical evidence indicates that the veteran's finger is fixed in a bent position and that the PIP joint is completely immobile. R. at 223. Therefore, although the fingertip might be less than 2 inches away from the veteran's palm, the medical evidence does not indicate that "motion" of the PIP joint to within 2 inches of the palm is possible.

■ Item (1) in the Ankylosis Preambles provides that ankylosis "of single digits and combinations of digits" will be rated as amputation when there is "[a]nkylosis of *both* the metacarpophalangeal and [PIP] joints, with *either* joint in extension or in extreme flexion". 38 C.F.R. § 4.71a, DCs 5216–23 (note) (1994) (emphasis added). "Extremely unfavorable ankylosis" (which we have held means the same thing as ankylosis "rated as amputation" pursuant to the Ankylosis Preambles) thus requires, in addition to ankylosis of both the metacarpophalangeal and PIP joints, that one of the ankylosed joints be either "in extension or in extreme flexion". The term "extreme flexion" is not defined for the fingers, although "flexion" for the knee is defined as extremely unfavorable when it is at an angle of 45 degrees or more (DC 5256), and ankylosis of the ankle receives a maximum rating when plantar flexion is greater than 40 degrees (DC 5270). If it were obvious that neither the metacarpophalangeal joint nor the PIP joint of the veteran's right little finger was in "extreme flexion", then the inadequacy of the record

regarding possible involvement of the metacarpophalangeal joint might not be prejudicial error pursuant to 38 U.S.C. § 7261(b). However, given the criteria regarding flexion in other diagnostic codes, it is not obvious that the 90–degree fixed flexion of the PIP joint of the veteran's right little finger is not "extreme flexion". Therefore, the inadequate assessment in the VA examinations regarding the involvement of the metacarpophalangeal joint, and the Board's permitting that assessment to stand, cannot be considered nonprejudicial error. *See Yabut* and *Godwin*, both *supra*.

In summary and in view of the above discussion, the Court holds that the record was inadequately developed, in light of VA's duty to assist under 38 U.S.C. § 5107(a), because of the lack of medical evidence on the issue of ankylosis of the metacarpophalangeal joint of the veteran's right little finger, and that the Board's statement of reasons or bases in the September 20, 1993, decision was inadequate because it did not address the March 1993 x-ray report that indicated "some" involvement of the metacarpophalangeal joint. R. at 224. On remand, VA should obtain a VA medical examination expressing an expert opinion on whether the metacarpophalangeal joint of the right little finger is ankylosed to any degree. *See* 38 C.F.R. § 20.901 (1994); *Suttmann* and *Green*, both *supra*. If ankylosis of the metacarpophalangeal joint is present, then VA must determine whether either the metacarpophalangeal or the PIP joint is "in extension or in extreme flexion". In its decision on remand, the Board must include an adequate statement of reasons or bases, including discussion of all material evidence and all material issues of fact and law presented on the record; that statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court if the BVA decision is appealed here. *See* 38 U.S.C. § 7104(d)(1); *Gabrielson, Masors,* and *Gilbert,* all *supra.*

■ **3. Scars:** The September 20, 1993, BVA decision denied a 10% rating pursuant to DCs 7803 and 7804 for scars. As noted

above in part II.A., DC 7803 in 38 C.F.R. § 4.118 provides for a 10% rating for scars that are "superficial, poorly nourished, with repeated ulceration", and DC 7804 provides for a 10% rating for scars that are "superficial, tender[,] and painful on objective demonstration". There is no indication in the record that the right-little-finger scars ever ulcerated. The veteran, in his 1992 hearing, testified under oath that the finger was painful when it came in contact with something; however, DC 7804 requires objective demonstration of a tender and painful scar, and the April 1993 VA medical examination report diagnosed the right-little-finger scars as "not significantly tender upon palpation." R. at 221. Therefore, the Court holds that there was a plausible basis in the record for the Board's determination that the criteria for a 10% rating under DC 7803 or 7804 were not met and that the noncompensable rating thus cannot be held to be clearly erroneous. *See Catalig* and *Gilbert*, both *supra.*

■ *4. Extraschedular consideration:* The veteran, in his August 1992 sworn testimony, averred that he had lost one job because of his injured finger and that the injury would harm his career prospects. R. at 191–92. The RO, in its June 1993 decision, stated that it had considered referral for extraschedular consideration pursuant to 38 C.F.R. § 3.321(b)(1), but that the case was "not considered so unusual or exceptional as to warrant its application." R. at 229. The Board, in the decision here on appeal, did not state whether it had reviewed the RO determination that referral for extraschedular evaluation was not appropriate. According to *Fisher, supra,* the BVA must address referral under § 3.321(b)(1) only where circumstances are presented which the Director of VA's Compensation and Pension Service might consider exceptional or unusual. In this case, there was no evidence of "an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards", and thus the Board was not required to discuss the possible application of § 3.321(b)(1).

## III. Conclusion

The Court affirms the September 20, 1993, BVA decision in part insofar as issues 3 and 4 above, but vacates the decision in part and remands the matter of an increased (compensable) right-little-finger rating for expeditious further development and readjudication, on the basis of all applicable law and regulation, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (requiring Secretary to ensure "expeditious treatment" for claims "remanded" by BVA or the Court); the February 16, 1995, Memorandum from J. Gary Hickman, Director, Compensation and Pension Service to Director, VA Regional Offices, *Bond v. Brown,* U.S.Vet.App. No. 93–146 (notifying RO Directors of "Priority Handling of Remanded Appeals by the Court of Veterans Appeals or the [Board]" and requiring that "[a]djudication management [ ] ensure that all Court/BVA remanded cases are properly and timely handled upon receipt"); and VA ADJUDICATION PROCEDURE MANUAL, M21–1, Part IV, paras. 38.02, 38.03 (providing for BVA and ROs to follow flagging procedure to afford "[s]pecial handling ... for all cases remanded by the Court"). *See* 38 U.S.C. §§ 1310, 5107(a), 7104(d)(1), 7261; 38 C.F.R. § 4.71a; *Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991). "On remand, the [claimant] will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.