Citation Nr: 1719108 
Decision Date: 05/31/17 Archive Date: 06/06/17

DOCKET NO. 11-13 886 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Muskogee, Oklahoma


THE ISSUES

1. Entitlement to an initial increased rating of post-traumatic stress disorder (PTSD), rated as 50 percent disabling up to August 19, 2015, and rated 30 percent disabling thereafter.

2. Entitlement to an initial increased rating of coronary artery disease status post coronary artery bypass graft (CAD), rated as 10 percent disabling up to August 16, 2015, and rated 30 percent disabling thereafter.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

Steve Ginski, Associate Counsel


INTRODUCTION

The Veteran served on active duty from July 1963 to December 1963 and from February 1965 to December 1969, with subsequent service in the National Guard.

These matters comes before the Board of Veterans' Appeals (BVA or Board) on appeal from an August 2010 rating decision (PTSD) and a November 2010 rating decision (CAD) issued by the Department of Veterans Affairs (VA) Regional Office (RO) Muskogee, Oklahoma.

The Veteran testified at a videoconference hearing before the undersigned Veterans Law Judge in June 2013.

Subsequently, the Board remanded these issues for additional development in September 2014. The appeal was recertified to the Board in October 2015, and has been returned to the Board for appellate consideration.

More than 90 days subsequent to when the appeal was recertified to the Board, the Veteran submitted additional evidence from Mercy Clinic Cardiology and a DBQ for CAD. In a statement submitted concurrent with the submission of the new evidence, the Veteran acknowledged that he had submitted evidence beyond the 90 day window to submit additional evidence. However, he noted that he had obtained a new cardiologist and had undergone another cardiac catheterization. His new cardiologist had completed a DBQ for heart conditions in May 2016, and the Veteran had been unable to obtain such records prior to their creation. The Board finds that the Veteran's provided reasons show good cause for submission of evidence after the 90 day period following certification to the Board. 38 C.F.R. § 20.1304 (b) (2016). As the Veteran submitted a May 2016 waiver of initial RO consideration of all evidence received after the most recent SSOC, the Board will proceed with adjudication of the Veteran's increased rating claim for his heart disorder. 38 U.S.C.A. § 7105 (e) (West 2014). 

The issue of entitlement to an increased rating for PTSD is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. Prior to August 18, 2015, the evidence demonstrates radiographic findings of cardiac hypertrophy.

2. Prior to May 5, 2016, the evidence does not approximate more than one episode of congestive heart failure in the past year, or a workload of 3 METs but not greater than 5 METs resulting in the appropriate symptoms, or left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

3. Beginning May 5, 2016, coronary artery disease manifests by a workload of 3 METs but not greater than 5 METs resulting in appropriate symptoms. 


CONCLUSIONS OF LAW

1. The criteria for a 30 percent rating for CAD from January 7, 2010, to August 17, 2015, have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.104, DC 7005 (2016).

2. The criteria for an initial rating in excess of 30 percent for CAD from August 18, 2015, to May 4, 2016, have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.104, DC 7005 (2016).

3. The criteria for a 60 percent rating for CAD beginning May 5, 2016, have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.104, DC 7005 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

The Veteran is challenging the evaluation assigned in connection with the grant of service connection for coronary artery disease. Where an underlying claim has been granted and there is disagreement as to "downstream" questions, the claim has been substantiated, and there is no need to provide additional § 5103 notice or prejudice from absent notice. Hartman v. Nicholson, 483 F.3d 1311, 1314-15 (Fed. Cir. 2007); VAOPGCPREC 8-2003 (Dec. 22, 2003).

In addition, the duty to assist the Veteran has also been satisfied in this case. The Veteran's service treatment records as well as all identified and available post-service medical records are in the claims file. The Veteran has not identified any available, outstanding records that are relevant to the claims decided herein. 

The Veteran was afforded multiple VA examinations in connection with his claims September 2010, July 2011, and August 2015. The Board finds that the VA examination reports, along with consideration of privately submitted Disability Benefits Questionnaires (DBQs), are adequate to decide the case because they are predicated on a review of the claims file or knowledge of the Veteran's medical history, as well as on an examination during which a history was solicited from the Veteran. In addition, the examinations, when taken together, fully address the rating criteria that are relevant to rating the disability in this case. Moreover, there is no objective evidence indicating that there has been a material change in the severity of the Veteran's service-connected disability since he was last examined. 38 C.F.R. § 3.327(a) (2016). The duty to assist does not require that a claim be remanded solely because of the passage of time since an otherwise adequate VA examination was conducted. Palczewski v. Nicholson, 21 Vet. App. 174 (2007) (noting that the passage of time alone, without an allegation of worsening, does not warrant a new examination); VAOPGCPREC 11-95 (April 7, 1995). Based on the foregoing, there is adequate medical evidence of record to make a determination in this case. Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion with respect to the issues on appeal has been met. 

The Board also finds substantial compliance with the September 2014 Board remand, which directed that the Veteran be provided an updated VA examination for his claimed disability. As discussed below, this examination was provided in August 2015. Thus, there has been substantial compliance with the prior remand. Stegall v. West, 11 Vet. App. 268, 271 (1998). 

For these reasons, the Board concludes that VA has fulfilled the duty to assist the Veteran in this case. Hence, there is no error or issue that precludes the Board from addressing the merits of this appeal.

II. Increased Ratings

The Veteran has been in receipt of a 30 percent rating for CAD since August 18, 2015. Prior to that date, he was in receipt of a 10 percent initial rating since he submitted his claim in January 2010. The Board will consider whether increased ratings are warranted for the entire appeal period.

 Factual History

Private treatment records from the Cooper Clinic, P.A., document regular treatment for diagnosed CAD. In May 2010, the Veteran's cardiac health was described as "doing reasonably well." The Veteran denied having chest pain or angina symptoms. The attending physician also denied any heart failure symptoms. There was no evidence of paroxysmal nocturnal dyspnea, orthopnea, palpitations, syncope, or near syncope. On examination, auscultation of the heart demonstrated a normal rate with regular rhythm. There was a 1-2/6 systolic ejection murmur heard best at the base of the heart. It was a mid-peaking murmur without obscuration of S3 or S4. CAD was noted to be clinically stable at that time. The attending physician noted no active angina, and he expressed doubts on the need to proceed with any nuclear stress testing. The Veteran was described as doing reasonably well. 

On September 2010 VA examination, the Veteran reported that he experienced angina and shortness of breath. He denied dizziness, syncope attacks, and fatigue. Examination of the heart did not reveal any evidence of congestive heart failure, cardiomegaly, or cor pulmonale. S1 and S2 were normal. The examiner further denied any heaves, thrills, murmurs, and gallops. His METs was 10.1. The stress test report indicated that the treadmill was stopped due to fatigue, and that the Veteran reached target heart rate. However, also identified was three beats of ventricular tachycardia, the laboratory finding was not sustained. 

Shortly thereafter, the Veteran presented for a visit with the Cooper Clinic, P.A., in October 2010. At that time, the Veteran's CAD was clinically stable, and the attending physician was not overly concerned with stress tests results from the recent VA examination. The physician was also not concerned by the "salve of triplet" that was seen on stress testing in the VA examination. 

Follow-up treatment notes from March 2011 from the Cooper Clinic, P.A., document the Veteran describing angina at the level of exercise when his heart rate would reach 110 to 116 beats per minute. He would also get tightness in his chest. The Veteran would on occasion be able to walk through the symptoms. However, he still would experience angina with "very limited exertional capacity." The Veteran denied paroxysmal nocturnal dyspnea or orthopnea, and the attending physician found no evidence of heart failure symptoms. The assessment noted that the Veteran had advanced native CAD status post previous bypass graft surgery with subsequent vein graft failure x 2. The Veteran was also having Canadian Class II-III angina symptoms with mild/moderate levels of exercise. The examiner cited to what appears to be the September 2010 VA examination report, noting that it was somewhat concerning that the Veteran did have stress-induced ventricular tachycardia. A future nuclear stress test was recommended to further assess the level of ischemia. However, the Veteran "clearly" had a level of ischemia with symptoms considered Canadian Class II-III level. In the assessment portion of the treatment record, the attending physician noted that the Veteran had a well-documented history of hypertensive heart disease with concentric left ventricular hypertrophy, for as long as he had known the Veteran. 

In May 2011, VA received statement from the Veteran dated in April 2011. The Veteran disagreed with the findings of the September 2010 VA examination, noting that he did not stop his stress test due to fatigue. He recalled actually experiencing angina and tightness during the actual test. He also contended that he did not reach his target heart rate, noting that his beats per minute only went up to 128 prior to the test being stopped. He asserted that the test was stopped due to him experiencing premature ventricular contractions. The Veteran concluded by commenting on his perceived state of cardiac health. After almost any prolonged exercise or activity, he would experience some level of angina pain. Using stairs to climb to the third floor of a structure, walking quickly more than 50 yards, using a chain saw, chopping with an ax, using a wheelbarrow or wagon, carrying a five gallon container for 100 feet, shoveling dirt, raking leaves, reaching over his head to trim tree limbs, and sweeping the floor, were all provided as examples of exercises that would produce "significant angina pain." 

The Veteran presented for another VA examination in July 2011. At that time, heart size, as determined by point of maximum impulse, was within normal limits. An examination revealed normal S1 and S2 findings, and there was no evidence of S3 or S4. The examiner noted that there was normal rate and regular rhythm, with no evidence of murmurs, gallops, heaves, or thrills. The examination further revealed no evidence of congestive heart failure, cardiomegaly, or cor pulmonale. Chest x-ray results were within normal limits. The examiner cited to the stress test conducted in September 2010 for the VA examination in that month, repeating the tests findings. The examiner noted that the Veteran's CAD effects were fatigue with moderate exertion. He was unable to walk more than one half mile due to fatigue. 

The Veteran presented for another appointment at the Cooper Clinic, P.A., in October 2012. At that time, the Veteran described having no recurrence of angina. He also noted no specific limitations other than those caused by his arthritis. He further denied any significant changes in exertional symptoms at that time, but if he did have shortness of breath with activities, he would slow down and take a break. The Veteran was noted to be clinically stable with his CAD at that time. 

In December 2012, the Veteran suffered a heart attack. Records from Sparks Regional Medical Center document unstable angina and non STEMI-segment elevation myocardial infarction. The Veteran underwent a right femoral arteriotomy, left heart catheterization with ventriculography, selective coronary angiography, saphenous vein graft angiography, left internal mammary artery angiography, angioplasty with stenting of the vein graft to first diagonal branch, Perclose repair of right femoral arteriotomy site. 

A January 2013 treatment record from Cooper Clinic, P.A., documents a follow-up visit showing the Veteran doing much better from a cardia standpoint. He would still experience a little first effort angina. However, the severe angina had completely resolved, and the Veteran was feeling "much better" with this. The attending physician indicated that it was permissible for the Veteran to resume an exercise bike protocol. The Veteran denied paroxysmal nocturnal dyspnea, orthopnea, palpitations, syncope, or near syncope. Another visit from May 2013 shows the same symptoms, with the attending physician noted that the Veteran was having class II angina consistent with his non-revascularized circumflex lesion. 

At the Veteran's June 2013 Board hearing, the Veteran testified that the stress test performed in September 2010 was inadequate. He asserts that the stress test was not stopped due to fatigue, but rather because the Veteran was experiencing premature ventricular contractions. He also asserts that he did not reach target heart rate, but rather was told to see his cardiologist immediately.

Next, of record is a July 2013 Disability Benefits Questionnaire completed by the Veteran's private physician at Cooper Clinic, P.A. The DBQ lists acute myocardial infarction in December 2012, CAD, atherosclerotic cardiovascular disease, stable and unstable angina, and hypertensive heart disease, as conditions applicable to the Veteran. The Veteran continuously took medications to treat his heart conditions. On examination, heart rhythm was regular, and the point of maximum impact was the fifth intercostal space. Heart sounds were normal, there was no jugular-venous distention, auscultation of the lungs was clear, and all pulses were normal. The completing physician found that the Veteran had Class II Angina. There was evidence of cardiac hypertrophy. The physician, again the Veteran's treating physician at Cooper Clinic, P.A., noted that the Veteran's heart disease had been manifested by cardiac hypertrophy since the initial diagnosis of CAD in May 2001. An interview-based METs test showed that the Veteran would have dyspnea, fatigue, and angina after greater than five to seven METs, this level being consistent with activities such as walking one flight of stairs, golfing (without cart), mowing the lawn, and heavy yard work. The completing physician noted that the interview-based METs test most accurately reflected the Veteran's current cardiac functional level because it was the most current test. Further, it was noted that the METs level was due solely to the Veteran's service-connected heart conditions. 

The Veteran underwent a VA examination for hypertension in September 2013. At that time, chest x-rays showed negative infiltrate and prior evidence of cardiac surgery. At that time, a heart examination revealed regular rhythm. The examination further revealed normal auscultation. The point of maximal impact was not palpable. However, an EKG showed no signs of cardiac dilation or hypertrophy. The EKG also revealed no signs of cardiac dilation, arrhythmias, and ischemia.

Pursuant to the Board's September 2014 remand, the Veteran presented for another VA examination in August 2015. After noting the Veteran's history, the examiner indicated that the Veteran had not had a myocardial infarction. There was no evidence of congestive heart failure, arrhythmia, heart valve condition, infectious heart conditions, or pericardial adhesions. The examiner next noted the Veteran's history of coronary artery bypass in June 2001 and his history of angioplasty in February 2001 and December 2012. On physical examination, heart rate and rhythm were normal. The point of maximal impact was not palpable. Heart sounds were normal, there was no jugular-venous distention, and auscultation of the lungs was clear. The examiner found no evidence of cardiac hypertrophy or dilation. An EKG was conducted for this examination, showing a left ventricular ejection fraction of 66 percent. An interview-based METs test showed the onset of fatigue at greater than five to seven METs. However, the examiner found that this level was solely due to the Veteran's deconditioning and osteoarthritis, not his heart disease. She reiterated that the Veteran's heart condition had no effect on his METs level, noting that the ejection fraction was the more objective indicator. 

The Veteran began seeing a new cardiologist in early 2016. A February 2016 treatment note from Mercy Clinic Cardiology documents the Veteran's medical history before revealing the Veteran gradually noticing what he thought was recurrent angina. This symptom had occurred subsequent to the Veteran's termination with his previous cardiologist. Angina seemed to be occurring with activity, but the Veteran reported that its onset was triggered by less of a workload. Activities triggering this would be walking briskly up a slight incline or trying to climb stairs or a ladder. Coffee or tea intake followed by exercise would trigger the symptom more. The attending physician discussed both nuclear stress imaging to assess the degree of ischemic burden and regional location of possible ischemia. The Veteran indicated he was comfortable with proceeding directly to cardiac catheterization, and the physician agreed. The procedure was completed shortly thereafter, still in February 2016. In a follow-up visit in March 2016, the attending physician noted that left ventricular ejection fraction at the time of the February 2016 catheterization was visually graded at 65 percent. Another visit from May 2016 did not provide any more medical insight than records already discussed. 

Finally, the Veteran submitted a May 4, 2016, DBQ that was completed by his current cardiologist at Mercy Clinic Cardiology. Current heart conditions were identified as the Veteran's December 2012 myocardial infarction, CAD, atherosclerotic cardiovascular disease, stable and unstable angina, and hypertensive heart disease. The Veteran had undergone a cardiac catheterization in February 2016, and his heart conditions required continuous medications to treat the disorder. As with the July 2013 DBQ, heart sounds were normal, there was no jugular-venous distention, auscultation of the lungs was clear, and all pulses were normal. The completing physician found that the Veteran had Class III Angina. The physician deferred his determination of whether the Veteran had cardiac hypertrophy until he could review results of a recent EKG. An interview-based METs test showed that the Veteran would have dyspnea, fatigue, and angina after greater than three to five METs, this level being consistent with activities such as light yard work, mowing the lawn with a power mower, and brisk walking. The completing physician noted that the interview-based METs test most accurately reflected the Veteran's current cardiac functional level. Further, it was noted that the METs level was due solely to the Veteran's service-connected heart conditions. 

 Legal Principles

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Schedule), found in 38 C.F.R. Part 4 (2016). The Schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1 (2016). Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016). When reasonable doubt arises as to the degree of disability, such doubt will be resolved in the Veteran's favor. 38 C.F.R. § 4.3 (2016). 

In considering the severity of a disability, it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41 (2016). Consideration of the whole-recorded history is necessary so that a rating may accurately reflect the elements of any disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). Although the regulations do not give past medical reports precedence over current findings, the Board is to consider the Veteran's medical history in determining the applicability of a higher rating for the entire period in which the appeal has been pending. Powell v. West, 13 Vet. App. 31, 34 (1999). 

Where entitlement to compensation has been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Where an appeal is based on an initial rating for a disability, however, evidence contemporaneous with the claim and the initial rating decision are most probative of the degree of disability existing when the initial rating was assigned and should be the evidence "used to decide whether an original rating on appeal was erroneous." Fenderson v. West, 12 Vet. App. 119, 126 (1999). In either case, if later evidence indicates that the degree of disability increased or decreased following the assignment of the initial rating, staged ratings may be assigned for separate periods of time. Fenderson, 12 Vet. App. at 126; Hart v. Mansfield, 21 Vet. App. 505 (2007) (noting that staged ratings are appropriate whenever the factual findings show distinct time periods in which a disability exhibits symptoms that warrant different ratings). When adjudicating a claim for an increased initial evaluation, the relevant time period is from the date of the claim. Moore v. Nicholson, 21 Vet. App. 211, 215 (2007), rev'd in irrelevant part, Moore v. Shinseki, 555 F.3d 1369 (2009). When adjudicating an increased rating claim, the relevant time period for consideration is the time period one year before the claim was filed. Hart, 21 Vet. App. at 509.

The Veteran's coronary artery disease has been evaluated under 38 C.F.R. § 4.104, DC 7005, which evaluates impairment from arteriosclerotic heart disease (coronary artery disease). Pursuant to DC 7005, a 30 percent rating is warranted for documented coronary artery disease resulting in workload of greater than five METs but not greater than seven METs results in dyspnea, fatigue, angina, dizziness or syncope, or; evidence of cardiac hypertrophy or dilatation on electrocardiogram, echocardiogram or X-ray. 38 C.F.R. § 4.104, DC 7005 (2016).

A 60 percent rating is warranted for documented coronary artery disease resulting in more than one episode of acute congestive heart failure in the past year, or; workload of greater than three METs but not greater than five METs results in dyspnea, fatigue, angina, dizziness or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent. Id.

A 100 percent rating is warranted for documented coronary artery disease resulting in chronic congestive heart failure, or; workload of three METs or less results in dyspnea, fatigue, angina, dizziness or syncope, or; left ventricular dysfunction with an ejection fraction of less than 30 percent. Id.

One MET is defined as the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for evaluation, and a laboratory determination cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 38 C.F.R. § 4.104, Note (2016).

These criteria are disjunctive rather than conjunctive, as demonstrated by "or" separating each symptom. See Johnson v. Brown, 7 Vet. App. 95 (1994) (only one disjunctive "or" requirement must be met in order for an increased rating to be assigned); compare Melson v. Derwinski, 1 Vet. App. 334 (1991) (use of the conjunctive "and" in a statutory provision meant that all of the conditions listed in the provision must be met). 

 Analysis

After a thorough review of the record, the Board finds that an increased rating of 30 percent is warranted prior to August 18, 2015, or, the period during which the Veteran's rating has been rated as 10 percent disabling. With reliance on the privately submitted DBQs, the Board finds that the Veteran's CAD has resulted in cardiac hypertrophy for the entire appeal period. This determination was provided by his cardiologist from Cooper Clinic, P.A., in the June 2013 DBQ. Then, cardiac hypertrophy was noted to have been present since the Veteran's initial diagnosis in 2001. Corroborating this finding is the same physician's March 2011 annotation that he had known the Veteran to have a medical history, in pertinent part, of cardiac hypertrophy since he had first treated him. VA is in receipt of records from before 2004 from this clinic, and the Board accords this finding probative weight due to the physician's extensive knowledge of the Veteran's medical history by virtue of being his treating physician. The Board also notes that the Veteran's treatment history with the Cooper Clinic, P.A., was marked with various medical procedures, including the initial coronary artery bypass in 2001. Thus, the finding of hypertrophy would have to be supported by radiographic evidence that would have accumulated during the Veteran's course of treatment with the clinic.

The Board acknowledges that VA examinations from September 2013 and August 2015 found no evidence of cardiac hypertrophy. First, the Board notes that the August 2015 VA examination is inadequate insofar as the examiner's opinions seemed to be premised on an inaccurate view of the Veteran's medical history. Specifically, the examiner indicated that the Veteran did not have a history of myocardial infarction, when in fact the Veteran suffered a myocardial infarction in December 2012, a fact well documented in the electronic record. Treatment records for the myocardial infarction show EKG evidence of hypertrophy. The Board finds that the August 2015 VA examination has limited probative value on account of this omission. Reonal v. Brown, 5 Vet. App. 458, 461 (1993). As for the findings of the September 2013 VA examination, which was conducted for service-connected hypertension, the Board finds that this evidence does not exceed the private treatment records in probative value. Thus, even with consideration of the negative evidence, the evidence pertaining to the question of whether the Veteran has had cardiac hypertrophy for the entire appeal period is in a relative state of equipoise. In such cases, the Board will resolve reasonable doubt in the Veteran's favor, and the Board finds that this symptom has present for the entire appeal period. 38 C.F.R. § 3.102.

The finding of cardiac hypertrophy is significant because one of the criteria listed in DC 7005 for a 30 percent rating is a finding of cardiac hypertrophy on x-ray. The Board finds that this criterion has been met. Therefore, a higher 30 percent rating is met for the entire appeal period. However, a higher 60 percent disability rating is not warranted prior to May 5, 2016. The evidence does not demonstrate more than one episode of congestive heart failure in the past year, or a workload of 3 METs but not greater than 5 METs resulting in the appropriate symptoms, or left ventricular dysfunction with an ejection fraction of 30 to 50 percent. 38 C.F.R. § DC 7005.

Beginning May 5, 2016, however, the Board finds that an increased rating of 60 percent is met. This date was provided on the private DBQ completed by the Veteran's treating physician at Mercy Clinic Cardiology. The Veteran's treating physician found that a workload of 3 METs but not greater than 5 METs would result in fatigue, dyspnea, and angina. The examiner premised this finding of an interview-based METs test, and the physician further noted that the Veteran's METs level was solely attributable to his service-connected CAD. The Board is satisfied as to the sufficiency of this finding, and accords it significant probative weight. The physician had treated the Veteran before and after a recent catheterization in February 2016, and he had the benefit of knowing the Veteran's immediate and pertinent medical history. His findings support the award of a 60 percent rating beginning May 5, 2016. 

However, a100 percent rating is not warranted at this point of the appeal because CAD has not resulted in chronic congestive heart failure, or, a workload of three METs or less resulting in dyspnea, fatigue, angina, dizziness or syncope, or, left ventricular dysfunction with an ejection fraction of less than 30 percent.

No additional higher or alternative ratings under different diagnostic codes are warranted in the instant case as the Veteran's service connected disability has consistently been characterized as arteriosclerotic heart disease or coronary artery disease. All potentially applicable diagnostic codes have been considered. 38 C.F.R. § 4.104, DCs 7005-7017 (2016); See Schafrath v. Derwinski, 1 Vet. App. 589, 593 (1991).

 Extraschedular Consideration

The Board has also considered the provisions of 38 C.F.R. § 3.321(b)(1). Barringer v. Peake, 22 Vet. App. 242, 243-44 (2008). However, in this case, the Board finds that the record does not show that the Veteran's CAD is so exceptional or unusual as to warrant the assignment of a higher rating on an extra-schedular basis. See 38 C.F.R. § 3.321(b)(1).

The threshold factor for extra-schedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Thun v. Peake, 22 Vet. App. 111 (2008). In this regard, there must be a comparison between the level of severity and symptomatology of the claimant's service- connected disability with the established criteria found in the rating schedule for that disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule and the assigned schedular evaluation is therefore adequate, and no extra-schedular referral is required. Thun, 22 Vet. App. 111; VAOGCPREC 6-96 (Aug. 16, 1996). Otherwise, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, VA must determine whether the claimant's exceptional disability picture exhibits other related factors, such as those marked interference with employment and frequent periods of hospitalization. 38 C.F.R. § 3.321(b)(1).

The evidence in this case does not show such an exceptional disability picture that the assigned schedular evaluations for the service-connected disability are inadequate. The Veteran's heart disease is currently rated under DC 7005. The symptoms are fatigue, angina, and dyspnea on exertion. There is also evidence of cardiac hypertrophy. These are all explicitly considered in the rating criteria. In addition, the schedular rating criteria for the Veteran's heart disease also provide for higher ratings for more severe symptomatology, which, as described above, is not shown. Therefore, there is no need to consider the downstream consideration of whether there is marked interference with the Veteran's employment or frequent hospitalizations. 38 C.F.R. § 3.321(b)(1) (2016); Bagwell v. Brown, 9 Vet. App. 337 (1996); Floyd v. Brown, 9 Vet. App. 88 (1996); Shipwash v. Brown, 8 Vet. App. 218 (1995). As such, the Board concludes that referral for extraschedular consideration is not warranted here.

In addition, a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. Johnson v. McDonald, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014). In this case, however, neither the Veteran nor the record has raised this contention. Yancy v. McDonald, No. 14-3390 (Ct. Vet. App. Jan. 12, 2016).


ORDER

Entitlement to an initial rating of 30 percent, but no higher, for coronary artery disease up to August 17, 2015, is granted. 

Entitlement to an initial rating in excess of 30 percent for coronary artery disease from August 18, 2015, to May 4, 2016, is denied. 

Entitlement to an initial rating of 60 percent, but no higher, for coronary artery disease is granted from May 5, 2016. 


REMAND

A remand by the Board confers on the Veteran, as a matter of law, the right to compliance with the terms of that remand. Stegall v. West, 11 Vet. App. 268 (1998).

The Board notes that VA, effective March 19, 2015, amended the portion of the Rating Schedule dealing with mental disorders so as to replace outdated references to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), with references to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). See 79 Fed. Reg. 149, 45094 (August 4, 2014). VA directed that the changes be applied only to applications for benefits received by VA or pending before the agency of original jurisdiction (AOJ) on or after August 4, 2014, but not to claims certified to, or pending before, the Board, the Court of Appeals for Veterans Claims (CAVC), or the United States Court of Appeals for the Federal Circuit. As the Veteran's claim was certified to the Board in August 2013 (prior to August 4, 2014), the DSM-IV governs in the instant appeal. This is significant because DSM-IV makes use of Global Assessment of Functioning (GAF) scores, while the DSM-5 does not. 

In September 2014, the Board directed that a new examination be provided to ascertain the current severity of the Veteran's service-connected psychiatric disorder. The Board specifically directed that the examiner should also provide a GAF score with an explanation of the significance of the score assigned. 

On remand, an examination was provided in August 2015. The examination was performed utilizing the DSM-5 criteria, and the examiner failed to provide a current GAF score. This lack of compliance is significant because the DSM-IV governs in this case, and a GAF score was specifically requested in the September 2014 remand. Thus, the Board finds that remand is necessary to obtain an adequate examination and for compliance with the prior remand.

Accordingly, the case is REMANDED for the following action:

1. Return the case to the same VA examiner who provided the August 2015 examination in order to obtain an addendum opinion. 

The examiner is asked to ascertain the severity of the Veteran's PTSD symptoms at the time of the August 2015 examination, making use of the DSM-IV, not the DSM 5. Further, the examiner must provide a GAF score with an explanation of the significance of the score assigned. 

If the examiner is unable to do so without further examination of the Veteran, an examination should be conducted to fully ascertain the severity of the Veteran's service-connected PTSD. The examination should be conducted using the DSM-IV criteria.

2. When the development requested has been completed, the AOJ should readjudicate the issue on appeal. If the benefit sought is not granted, the Veteran and his representative should be furnished a Supplemental Statement of the Case. The Veteran should be afforded a reasonable opportunity to respond before the record is returned to the Board for further review. 

The appellant has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
Kelli A. Kordich
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs