Citation Nr: 1722227 
Decision Date: 06/15/17 Archive Date: 06/29/17

DOCKET NO. 09-25 114 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Pittsburgh, Pennsylvania


THE ISSUES

1. Entitlement to an initial evaluation in excess of 10 percent disabling prior to February 28, 2011, an evaluation in excess of 30 percent disabling prior to May 28, 2013, an evaluation in excess of 50 percent disabling prior to May 12, 2016, and an evaluation in excess of 70 percent disabling thereafter for posttraumatic stress disorder (PTSD). 

2. Entitlement to a total disability evaluation based on individual unemployability due to service-connected disabilities (TDIU). 


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran
ATTORNEY FOR THE BOARD

Y. Taylor, Associate Counsel


INTRODUCTION

The Veteran served on active duty from August 1965 to June 1969. He was awarded a Combat Action Ribbon among his awards and decorations.

This matter initially came before the Board of Veterans' Appeals (Board) on appeal from a rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Pittsburgh, Pennsylvania.

The Board previously remanded this case for additional development in September 2012 and January 2013. The issue is once again before the Board. 

The Veteran testified before the undersigned Veterans Law Judge (VLJ) during a November 2012 videoconference hearing and a transcript of that hearing has been included in the Veteran's claims file. 

This appeal was processed using the Veterans Benefits Management System (VBMS) and Virtual VA paperless claims processing system. Accordingly, any future consideration of the Veteran's case should take into account the existence of this electronic record. 


FINDINGS OF FACT

1. Since the claim for service connection for PTSD was received and prior December 20, 2009, it is as likely as not that the Veteran's PTSD resulted in his depressed mood, anxiety, suspiciousness, and chronic sleep impairment, and those symptoms interfered with his work and social life with reduced productivity and effectiveness; the evidence does not show speech impairment, memory impairment, impaired judgment, nor impaired abstract thinking during this period. 

2. From December 20, 2009, it is as likely as not that the Veteran has experienced suicidal ideation; near-continuous depression affecting the ability to function independently, appropriately and effectively; difficulty in adapting to stressful circumstances (including work setting); inability to establish and maintain effective relationships, resulting in occupational and social impairment, with deficiencies in most areas, such as work, family relations, judgment, thinking, or mood. Although the Veteran reported to have olfactory hallucinations, the evidence does not show gross impairment in thought process or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others. He has been independent in all of his activities of daily living. The Veteran does not suffer from disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 

3. The Veteran is not prevented from securing and maintaining substantially gainful employment by his service-connected disabilities. 


CONCLUSION OF LAW

1. With resolution of reasonable doubt in the Veteran's favor, the criteria for an initial disability rating of 30 percent rating, but no higher, for PTSD have been met prior to December 20, 2009. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.3, 4.7, 4.130, Diagnostic Code 9411 (2016).

2. With resolution of reasonable doubt in the Veteran's favor, the criteria for a disability rating of 70 percent rating, but no higher, for PTSD have not met since December 20, 2009. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.3, 4.7, 4.130, Diagnostic Code 9411 (2016). 

3. The criteria for entitlement to TDIU were not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.15, 4.16, 4.18 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. Duty to Notify and Assist

Because service connection, an initial rating, and an effective date have been assigned, the notice requirements of the Veterans Claims Assistance Act (VCAA), 38 U.S.C.A. § 5103 (a) have been met. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007). Consequently, discussion of VA's compliance with VCAA notice requirements as they relate to the increased rating claims would serve no useful purpose.

VA has made reasonable efforts to assist the appellant by obtaining relevant records which he has adequately identified. This includes securing service, VA, and private treatment records and providing VA examinations. The Veteran was notified and is aware of the evidence needed to substantiate his claim, the avenues through which he might obtain such evidence, and the allocation of responsibilities between himself and VA in obtaining such evidence. In sum, there is no evidence of any VA error in notifying or assisting the Veteran that reasonably affects the fairness of this adjudication. 38 C.F.R. § 3.159 (c) (2016).

The Veteran was also provided with VA examinations with the latest dated in May 2016. The examination is adequate, as the examiner reviewed the Veteran's medical history, including his STRs, interviewed and examined the Veteran in person, and provided sufficiently detailed findings concerning his PTSD. Stefl v. Nicholson, 21 Vet. App. 120, 123-24 (2007); Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007) (holding that once VA undertakes the effort to provide an examination when developing a claim, even if not statutorily obligated to do so, VA must ensure that the examination provided is adequate). 

As the Veteran has not identified any additional evidence relevant to the claim and as there are no additional records to obtain, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to the claims is required to comply with the duty to assist. 38 U.S.C.A. § 5107(a) (West 2014). 

Further, as the requested development has been completed, no further action is necessary to comply with the Board's remand directives. Stegall v. West, 11 Vet. App. 268, 271 (1998). 

II. Increased Ratings for PTSD

Law and Regulations

Generally, disability ratings are determined by applying the criteria set forth in the VA Schedule of Rating Disabilities in 38 C.F.R. Part 4. The percentage ratings are based on the average impairment of earning capacity as a result of a service-connected disability, and separate diagnostic codes identify the various disabilities and the criteria for specific ratings. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2016). 

The veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where, as here, the question for consideration is the propriety of the initial evaluation assigned, evaluation of the medical evidence since the grant of service connection and consideration of the appropriateness of a "staged rating" is required. Fenderson v. West, 12 Vet. App. 119, 126 (1999). The Board will also consider entitlement to staged ratings to compensate for times since filing the claim when the disability may have been more severe than at other times during the course of the claim on appeal. Hart v. Mansfield, 21 Vet. App. 505 (2007).

If two disability evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016). All reasonable doubt as to the degree of disability will be resolved in favor of the claimant. 38 C.F.R. § 4.3 (2016).

PTSD is evaluated under the provisions of 38 C.F.R. § 4.130, and is subject to the criteria of the General Rating Formula for Mental Disorders that provide for the following: 

A 10 percent rating for mental illness is warranted for occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. 

A 30 percent evaluation is warranted where there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory; impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 

To demonstrate entitlement to a 70 percent evaluation, the evidence must show
occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including worker a work like setting); inability to establish and maintain effective relationships.

Entitlement to a 100 percent scheduler evaluation is warranted where there are such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; gross inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016).

Consideration is given to the frequency, severity, and duration of psychiatric symptoms, the length of remission, and the Veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment, rather than solely on the examiner's assessment of the level of disability at the moment of the examination. See 38 C.F.R. § 4.126 (a) (2016). Furthermore, when evaluating the level of disability arising from a mental disorder, the rating agency will consider the extent of social impairment, but shall not assign an evaluation solely on the basis of social impairment. 38 C.F.R. § 4.126 (b) (2016). It is necessary to evaluate a disability from the point of view of the Veteran working or seeking work. 38 C.F.R. § 4.2 (2016).

The symptoms associated with the psychiatric rating criteria are not intended to constitute exhaustive lists, but rather serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436, 443 (2002). Thus, the Board will consider whether "the evidence demonstrates that a claimant suffers symptoms or effects that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the diagnostic code," and, if so, the "equivalent rating will be assigned." Id. The Federal Circuit held that a Veteran may only qualify for a given disability rating "by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration." Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013) ("Reading [38 C.F.R. §§ 4.126 and 4.130] together, it is evident that the 'frequency, severity, and duration' of a Veteran's symptoms must play an important role in determining his disability level.").

Prior to August 4, 2014, one factor in evaluating psychiatric disorders was the global assessment of functioning score scale (GAF). The scale was meant to represent psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM -IV)). Because this case was pending before the effective date of the regulatory change, the Board may consider the several global assessment of functioning scores assigned by VA examiners and other mental health personnel. See 79 Fed. Reg. 45,093-02, 45,094 (August 4, 2014).

Under DMS-IV, the GAF is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. Carpenter v. Brown, 8 Vet. App. 240 (1995). Pertinent to this case, GAF scores ranging from 61 to 70 indicate that a veteran has some mild psychiatric symptoms (e.g., depressed mood and mild insomnia) or experiences some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household); however, the veteran is found to generally be functioning pretty well and has some meaningful interpersonal relationships. GAF scores ranging from 51 to 60 indicate moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers and co-workers). GAF scores of 41 to 50 indicate serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). While the Rating Schedule does indicate that the rating agency must be familiar with the DSM-IV, it does not assign disability percentages based solely on GAF scores. See 38 C.F.R. § 4.130 (2016).

Competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also mean statements conveying sound medical principles found in medical treatises. It also includes statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159(a)(1) (2016). Competent lay evidence means any evidence not requiring that the proponent have specialized education, training, or experience. Lay evidence is competent if it is provided by a person who has knowledge of the facts or circumstances and conveys matters that can be observed and described by a lay person. 38 C.F.R. § 3.159(a)(2) (2016). In essence, lay testimony is competent when it regards the readily observable features or symptoms of injury or illness. Layno v. Brown, 6 Vet. App. 465, 469 (1994).

If the evidence is competent, the Board must then determine if the evidence is credible, or worthy of belief. Barr v. Nicholson, 21 Vet. App. 303, 308 (2007) (observing that once evidence is determined to be competent, the Board must determine whether such evidence is also credible). After determining the competency and credibility of evidence, the Board must then weigh its probative value. Caluza v. Brown, 7 Vet. App. 498, 511-12 (1995).

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107 (West 2014) ; Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

Factual Background and Legal Analysis

1. Evaluation prior to December 20, 2009. 

Facts: 

On November 29, 2007, the Veteran reported to the VA Medical Center (VAMC), complaining of his failed relationship. He reported that over the last couple of years he had felt more depressed, secondary to reflection on his life and relationship problems. He was observed to be clearly anxious and slight tremor was noticeable in his hands. The mood was reported to be depressed and anxious. The Veteran stated that he had sleep disturbance and crying spells that come unexpectedly. The initial assessment of GAF was 60-65. 

The initial psychological evaluation was conducted on December 18, 2007. The diagnosis of PTSD was given during this visit. The Veteran received GAF of 62, which lasted until February 1, 2008 when it was elevated to 65. 

An April 2008 VA Mental Health Note states that the Veteran felt groggy after taking trazodone. He reported that the nightmares were getting less frequent. The tremor of both hands was sporadic, but he reported jerky movements while falling asleep. 

The Veteran was afforded a VA examination in May 2008. During the examination, the Veteran reported that he had a generally good childhood with good relationship with his parents and no family history of psychiatric or psychological treatment or problems. He generally did well throughout high school and had normal socialization. 

While he served in Vietnam from May 1966 to July 1967, he did construction and demolition work, particularly focusing on landmines. He reported four stressors during the examination, ranging from his experience of having his colleague blown up by landmines and seeing children's dead bodies after a village was attacked. 

After he separated from service, the Veteran worked in the steel mill for 23 years as an electrician. His first marriage lasted from 1970 to 1984. During this time, the Veteran had his first divorce and obtained custody of his two children. He then went self-employed for 2 years as an electrician. Due to financial consideration, he took a job with a school district. He remarried at this time and the second marriage lasted from 1990 to 2002. During this time, he worked for the school district for several years. Then, he took a different job due to financial reasons and did sales and driving. He also worked as a school bus driver. Eventually, he obtained a stable job with benefits. He had some conflict with his supervisor. He went through the second divorce during this time and retained custody of his two sons. He reported that he had no social life and he had to have a meaningful relationship of some kind. His was assigned 69 and then 68 for GAF in April 2008 when he met VA therapists. 

The Veteran reported that he was having weird and frustrating dreams. He experienced flashes at night and loud voices in dreams. But his sleep improved with medications. Reported mood was irritable, moody, and somewhat depressed and blasé. He lost weights. He denied suicidal or homicidal ideation, and no hallucinations or delusions were reported or elicited. He stated that his socialization was non-existent. 

During the examination, the GAF score of 70 was assigned because of some mild symptoms or some mild difficulties in social or occupational functioning, secondary to mild PTSD. 

In the summary and discussion section, the examiner noted that the Veteran reported irritability, hyperarousal, hypervigilance, avoidance, and mild intrusive recollections of his Vietnam experiences. He appeared to have had some difficulty with relationships, currently in dating relationships. He was taking trazodone at night and Prozac in the morning. These medications had been effective in reducing his irritability and increasing his patience, as well as significantly improving his sleep and decreasing nightmares. 

Starting in the fall of 2008, the Veteran repeatedly expressed his concern for his PTSD medications interfering with his work. 

In a November 2008 therapy session, the Veteran stated that trazodone was working well, but he was going to start work and can be called in any time. The doctor and the Veteran considered decreasing the dose. 

In a December 2008 therapy session, the doctor noted that the Veteran continued to struggle with sleep, especially on nights when he didn't take his trazodone. He didn't want to take trazodone on nights when he might be called for snow removal work because he didn't want to be groggy while driving. 

A January 6, 2009 addendum note describes that the Veteran slept well when he took trazodone, but could sleep only few hours without it. The Veteran was concerned about effects of his medication on his driving as he could be called at any time during snow storms. The Veteran was advised not to drive or operate machinery requiring fine motor skills if he felt drowsy. He again reported that he didn't want to take trazodone on nights when he might be called for snow removal work because he didn't want to be groggy while driving. The Veteran was trying to practice relaxation prior to going to bed and avoid looking at his clock when he awakened at night, but he continued to worry on nights when he might be called to work. He planned on talking to his supervisors at work tomorrow about this concern to see if there was any arrangement they could work out. 

In February 2009, a psychiatry resident noted that the Veteran was feeling much better now that his employers were aware of his treatment at VA. The Veteran had been hesitant to terminate therapy or to even reduce the frequency of therapy appointments, feeling that his progress was tied directly to these providers' weekly interventions. 

The Veteran's PTSD symptoms seemed to have improved during this time. For example, a March 2009 mental health note indicates that the Veteran reported his old, confident self was emerging and he was having some very good days. He had contacted friends and was beginning to confront his fears appropriately. The Veteran was spending more quality time with his family. However, the Veteran had been hesitant to terminate therapy or to even reduce the frequency of therapy appointments, feeling that his progress was tied directly to his provider's weekly interventions. 

The Veteran shared his difficult situations at work starting from the fall 2009, which precipitated his voluntary early retirement from his work due to his PTSD symptoms. 

Specifically, an October 2009 group counseling note shows that the Veteran shared with the group a difficult situation he experienced this past week when he lost his temper. He also discussed feeling depressed for the rest of the week and described how he was "beating himself up" about it. The Veteran looked to other members for support and thanked them when he thought their suggestions were helpful. 

According to a November 2009 group counseling note, the Veteran discussed an incident that occurred with his boss. The Veteran's boss questioned him about his continued use of medication and commented that the Veteran should move beyond his problems. The Veteran reported that he got very angry and left work. The Veteran discussed coping with the incident by speaking with his daughter on the phone. He subsequently had his medications re-evaluated. The Veteran looked to other group members for support in how to proceed with dealing with the problem because he would like to remain employed in his position. The Veteran expressed disappointment with himself for how he reacted in the situation. 

Shortly after, on December 20, 2009, the Veteran retired early from the job. See e.g., January 2015 VA 21-8940. 

The retirement took some emotional burden from the Veteran as demonstrated by a January 2010 group counseling note. During the January counseling session, the Veteran reported that he quitted his job before the New Year. He discussed the positive effect that this had had on his sense of well-being and how it gave him relief from the frustrations and conflict he was experiencing there. However, the Veteran did express some uncertainty about his ability to make ends meet in the future with his remaining sources of income. 

During the period between November 27, 2007 and December 20, 2009, the Veteran's GAF fluctuates between 62 and 70. 

Legal Analysis: 

The Veteran's symptomatology more nearly approximates the 30 percent criteria for the period prior to December 20, 2009, because the record summarized above indicates that he suffered from depressed mood, anxiety, suspiciousness, and chronic sleep impairment and that those symptoms interfered with his work and social life with reduced productivity and effectiveness. 

Here, during the period between November 2007 and December 2009, the VA mental clinic records demonstrate that the Veteran consistently reported his depressed and anxious mood, his hypervigilance, and his sleep problems including frequent nightmares. He has been taking trazodone and he was extremely concerned about the possibility of the side effect of the medication interfering with his work. He expressed this concern at every meeting he had at the VAMC. Further, due to his PTSD conditions and associated treatment and medication, the Veteran often had conflicts with his supervisor. The conflicts escalated over time and eventually led the Veteran to take early retirement so that he could continue to receive treatment for his PTSD at the VAMC. 

Therefore, after carefully reviewing the extensive VA clinical data pertaining to the Veteran's service-connected PTSD and resolving reasonable doubt in favor of the Veteran, the Board finds that the criteria for the 30 percent evaluation for PTSD have been met prior to December 20, 2009. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016); 38 U.S.C.A. § 5107 (West 2014) ; Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). 

However, the Veteran's symptomatology does not meet the criteria for the 50 percent disabling. Although the Veteran exhibited disturbances of motivation and mood and difficulty in establishing and maintaining effective work and social relationships, the evidence does not show speech impairment, memory impairment, impaired judgment, or impaired abstract thinking. 

Here, at any time during the period in consideration, the evidence does not reflect that the Veteran suffered from speech impairment, memory impairment, impaired judgment, or impaired abstract thinking. Further, the evidence does not demonstrate that the Veteran's symptoms constitute the severity, frequency, and duration for the Veteran's motivation and mood disturbance or difficulty in establishing and maintaining effective work and social relationships to the degree required by the 50 percent rating, i.e., the degree sufficient to depart from the 30 percent rating requirement of occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks. Vazquez-Claudiov. Shinseki, 713 F. 3d 112, 116-17(holding that because "[a]ll nonzero disability levels [in § 4.130] are also associated with objectively observable symptomatology," and the plain language of the regulation makes it clear that "the veteran's impairment must be 'due to' those symptoms," "a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration."). 

In conclusion, the evidence demonstrates that the Veteran's PTSD symptoms are fully and appropriately addressed by the criteria for a 30 percent rating for the period prior to December 20, 2009, but there is no suggestion that the Veteran suffered from speech impairment, memory impairment, impaired judgment, nor impaired abstract thinking nor that the degree of occupational and social impairment was sufficient to warrant a higher rating. Therefore, a 50 percent rating for PTSD is not warranted. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016). 

2. Evaluation after December 20, 2009 

Facts: 

A March 2010 group counseling note indicates that the Veteran had three nights in a row of insomnia, which led him to go to a bar and drink, believing that this would help him sleep. Instead, he drank until intoxication and blacked out. He was told later that he got in a physical fight with someone else at the bar, broke a beer bottle on the man's head and was subsequently escorted out. He took full blame for the incident and the choices he made which led up to it. 

In May 2010, the Veteran was seen for tremor in his upper extremity See May 2010 Neurology Consult Pittsburgh VAMC. The Veteran reported an upper extremity tremor with good temporal correlation with the use of lueoxetine about 3 years ago. The tremor could be nonexistent or moderately severe, particularly when he was trying to eat soup, use a screwdriver, or use a soldering iron. The Veteran emphatically stated that this medication [lueoxetine] had helped him immensely with respect to anxiety and depression, and he stated that if the medication was causing the tremor he would much rather stay on it and deal with the tremor rather than switch off of it and lose psychiatric control. 

In a February 2011 group counseling session, the Veteran's GAF was revised from 65 to 60. 

The Veteran was afforded a new VA examination in May 2013 to assess his PTSD conditions. The last examination was in May 2008. 

The examiner determined that the Veteran had occupational and social impairment with reduced reliability and productivity due to his PTSD. He reported his retirement from the road maintenance work for a township due to his problems with management and specifically several disagreements with his supervisor. He reported being written up twice for subordination. He did not obtain any additional educational degrees or other jobs since then. 

The Veteran was diagnosed with the following symptoms: anxiety, chronic sleep impairment, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, and suicidal ideation. He was able to manage his own finances. 

The examiner found that the Veteran's thought processes were logical, sequential and goal oriented. No frank paranoia or other delusions were elicited. He denied frank hallucinations in all modalities. He might have occasionally had olfactory hallucinations in concert with intrusive thoughts. His mood was edgy, irritable, grumpy and useless. He noted a history of occasional passive suicidal ideation. He denied any plan, intent or history of attempts. He denied homicidal ideation and intent. He endorsed daily crying spells. He was independent in all of his activities of daily living and socializes primarily with his family. 

He reported intrusive thoughts of the military on most days. He has nightmares 1-2 times per week. He endorsed hypervigilance and hyperstartle reaction. He also endorsed feelings of estrangement. 

The examiner concluded that since the last examination in 2008, the Veteran's symptoms of PTSD had worsened despite his compliance with regular psychiatric and psychological treatment recommendations. His GAF was determined to be 60. It was concluded, however, that were he not already retired, his psychiatric symptoms would not prevent him from working. 

The Veteran was afforded a new VA examination for PTSD in May 2016. The Veteran reported symptoms associated with PTSD such as intrusion symptoms, including distressing memories and nightmares several times per week. The Veteran noted that he continued to experience physiological arousal and emotional distress in response to memories of the traumatic event. He also described startled response and disturbed sleep. The Veteran stated that he continued to experience a chronically depressed mood and he was unable to experience positive emotion. He endorsed avoidance behaviors and impaired concentration. He reported negative beliefs about himself, following the traumatic event as well as mood disturbance, characterized by depressed mood. He reported diminished interest in his typical activates and lack of motivation. 

The examiner determined that the Veteran had occupational and social impairment with reduced reliability and productivity. It was indicated that with continued treatment some improvement would be expected.

An occupational history shows that the Veteran was currently not working. Socially, the Veteran did not enjoy interacting with his family. He continues to participate in military funerals. The Veteran indicated that his interest/engagement in pleasurable activities was low and that he was not involved in any other activities of note. In general, the Veteran's social and marital functioning was consistent with his previous examination. 

The Veteran reported intermittent (passive) suicidal ideation, but denied having a specific plan to harm himself. 

The Veteran reported that he experienced intrusion symptoms, including distressing memories and nightmares several times per week. The Veteran noted that he continued to experience physiological arousal and emotional distress in response to memories of the traumatic event. The Veteran also described an exaggerated startle response and disturbed sleep. He reported inability to experience positive emotion. He indicated that he was socially withdrawn and described hypervigilance. He endorsed avoidance behaviors and impaired concentration. In general, the Veteran's reported symptoms of PTSD remain consistent with his previous C&P examination. 

The Veteran was determined to have the following symptoms: depressed mood, anxiety, chronic sleep impairment, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, including work or a work like setting, and suicidal ideation. 

In July 2016, the Veteran submitted a statement explaining how his PTSD conditions impacted his work and how it led to his early retirement. In it, he explained he was not able to work with others effectively and had difficulty with authority. He reported that he was written up at least twice. Vet claims that he retired when he was 62 due to his conflict/problems with supervisor. One of the issues was his medications for PTSD. The Veteran had a car accident in March 2008, for which he was written up. He stated that he was willing to work especially to support his children, but he couldn't. 

Legal Analysis: 

The Veteran's symptomatology more nearly approximates the 70 percent criteria after December 20, 2009, because the record summarized above indicates that he suffered from suicidal ideation; near-continuous depression affecting the ability to function independently, appropriately and effectively; difficulty in adapting to stressful circumstances (including work setting); inability to establish and maintain effective relationships, resulting in occupational and social impairment, with deficiencies in most areas, such as work, family relations, judgment, thinking, or mood. 

Here, on December 20, 2009, the Veteran took early retirement due to his difficulty in adapting stressful circumstances with his supervisors over his PTSD conditions. In January 2010, the Veteran shared the news with participants of the group counseling session at VAMC and expressed his relief that he no longer had to deal with stressful situations at work. In March 2010, the Veteran got drunk and got into a fight due to depression-induced insomnia, which he admitted later that his action was inappropriate. Indeed, in both May 2013 and May 2016 VA examinations, the Veteran was diagnosed with the symptom of difficulty in establishing work and family relationships. Other symptoms noted in VA examinations are depressed mood, anxiety, and sleep impairment as well as suicidal ideation. 

Therefore, after carefully reviewing the extensive VA clinical data pertaining to the Veteran's service-connected PTSD and resolving reasonable doubt in favor of the Veteran, the Board finds that the criteria for the 70 percent evaluation for PTSD have been met for the period after December 20, 2009. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016); 38 U.S.C.A. § 5107 (West 2014) ; Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). 

However, the Veteran's symptomatology does not meet the criteria for the 100 percent disabling. Although the Veteran reported to have olfactory hallucinations, the evidence does not show gross impairment in thought process or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others. The May 2016 VA examination noted that he was independent in all of his activities of daily living. The evidence demonstrated that the Veteran does not suffer from disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 

In conclusion, the evidence demonstrates that it is as likely as not that the Veteran's PTSD symptoms are fully and appropriately addressed by the criteria for a 70 percent rating after December 20, 2009, but there is no suggestion that the Veteran suffered from any of the symptoms listed in the 100 percent criterion. Therefore, a 100 percent rating for PTSD is not warranted. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016). 

III. Extraschedular Ratings

The Board has also considered whether the Veteran's PTSD presents an exceptional or unusual disability picture as to render impractical the application of the regular scheduler standards such that referral to the appropriate officials for consideration of extraschedular ratings is warranted. See 38 C.F.R. § 3.321 (b)(1) (2016); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). In this case there are no exceptional or unusual factors with regard to the Veteran's PTSD. The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluation for that service-connected disability is inadequate. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993) (holding that the "rating schedule will apply unless there are 'exceptional or unusual' factors which render application of the schedule impractical."). 

Here, the rating criteria reasonably describe the Veteran's disability level and symptomatology and provide for consideration of greater disability and symptoms than currently shown by the evidence. The reason for not meeting the higher rating here is that his PTSD condition lacks many of the symptoms listed for the higher rating. Further, the rating criteria provide for consideration of greater disability and symptoms because the rating criteria in its entirety cover all the symptoms reported by the Veteran. Thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. See Thun v. Peake, 22 Vet. App. 111, 115 (2008). 

Even if the rating criteria do not contemplate the level of disability and symptomatology and are found to be inadequate, the Veteran's disability picture does not exhibit other related factors such as those provided by the regulation as "governing norms." Thun v. Peake, 22 Vet. App. 111, 115 (2008). 

Generally, the "governing norms" contemplate a disability picture that has related factors such as marked interference with employment or frequent periods of hospitalization. In the absence of the evidence of such factors as marked interference with employment or frequent periods of hospitalization, the Board is not required to remand to the RO for the procedural actions outlined in 38 C.F.R. § 3.321(b)(1). See Bagwell v. Brown, 9 Vet. App. 237, 238-39 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995). 

Here, the record indicates that the Veteran has not been hospitalized for his PTSD. The evidence also shows that the Veteran retired early due to conflicts with his supervisor over his PTSD conditions, indicating that the Veteran's PTSD interfered with his employment. However, this early retirement was a result of his "difficulty in adapting to stressful circumstances" in a work setting and his "inability to establish and maintain effective relationships," and these symptoms are already listed in the criteria for the 70 percent rating. Therefore, the Veteran's disabilities resulting from PTSD are already taken into account under the existing rating criteria and do not exhibit related factors that could be contemplated as governing norms by the regulation and hence, the procedural actions outlined in 38 C.F.R. § 3.321(b)(1) are not necessary. 

Consequently, referral for extraschedular consideration is not warranted under Thun. 

IV. TDIU

Total disability ratings for compensation may be assigned where the schedular rating is less than total, when the disable person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. 38 C.F.R. § 4.16(a) (2016). TDIU can be implied. Rice v. Shinseki, 22 Vet. App. 447 (2009). 

"[A] request for TDIU, whether expressly raised by a veteran or reasonably raised by the record, is not a separate claim for benefits, but rather involves an attempt to obtain an appropriate rating for a disability or disabilities, either as part of the initial adjudication of a claim or, if a disability upon which entitlement to TDIU is based has already been found to be service connected, as part of a claim for increased compensation." Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). When entitlement to TDIU is raised during the appeal of the rating assigned for that disability, it is part of the claim for benefits for the underlying disability. Id. at 455. 

Here, in support of his claim, the Veteran completed and submitted VA Form 21-8940 ("Veteran's Application for Increased Compensation Based on Unemployability") in December 2014. It identified one previous employer, a township in Pennsylvania, and indicated that the Veteran worked there as a full-time employee from an unspecified date in 2002 to December 2009 and that he became too disable to work in November 2009. Therefore, the Board considers whether the Veteran is entitled to TDIU. 

Where the scheduler rating is less than total, a total disability rating for compensation purposes may be assigned when the disabled person is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, this disability shall be ratable at 60 percent or more, or if there are two or more disabilities, there shall be at least one ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a). In circumstances where a Veteran does not meet the aforementioned percentage requirements, a total rating may nonetheless be assigned upon a showing that the individual is unable to obtain or retain substantially gainful employment. 38 C.F.R. § 4.16 (b).

Here, service connection is currently in effect for the following disabilities: PTSD (70% disabling from December 20, 2009); bilateral hearing loss (40% disabling from January 26, 2015); tinnitus (10% disabling from November 26, 2006). The Veteran's combined evaluation is 84% from January 26, 2015. 38 C.F.R. § 4.25-26. See also July 2016 Rating Decision. Thus, the Veteran meets the minimum percentage requirements for consideration of a TDIU under 38 C.F.R. § 4.16(a). 

It remains to be determined whether the Veteran's service-connected disabilities render him unemployable. 

For the Veteran to prevail in a claim for TDIU, the evidence must show that he is unable to pursue a substantially gainful occupation due to his service-connected disabilities. The sole fact that a Veteran is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is recognition that the impairment makes it difficult to obtain or keep employment, but the ultimate question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether he or she can find employment. Van Hoose v. Brown, 4 Vet. App. 361 (1993).

Here, the evidence shows that even though the Veteran had difficulty with a supervisor over his PTSD conditions, which led to his early retirement, the Veteran was considered employable and is able to pursue a substantially gainful occupation as of May 2013. Documents from the employer indicated the Veteran took voluntary retirement. It is noted that age is not for consideration in awarding this benefit. 

In the May 2013 VA examination report, the examiner stated that since the last examination in 2008, the Veteran's symptoms of PTSD had worsened despite his compliance with regular psychiatric and psychological treatment recommendations. It was concluded, however, that were he not already retired, his psychiatric symptoms would not prevent him from working. Further, the May 2016 VA examination determined that the Veteran's PTSD symptoms were substantially the same as those reported in the May 2013 examination. Therefore, the Board finds that the Veteran's PTSD conditions, which caused the Veteran to retire early from a particular job as a driver and laborer, do not rise to the level of rending him unemployable. Again, the last examiner thought there might be improvement in symptoms with continued treatment.

Therefore, the requirement for a TDIU is not met. 

The Board has considered the benefit of the doubt doctrine, but as the preponderance of the evidence is against the claim, that doctrine is not applicable. 38 U.S.C.A. § 5107 (b) (West 2014); Gilbert, 1 Vet. App. at 55-57.


ORDER

Entitlement to an initial evaluation of 30 percent, but no higher, for PTSD is granted prior to December 20, 2009, subject to the law and regulations governing the payment of monetary benefits.

Entitlement to an evaluation of 70 percent, but no higher, for PTSD is granted after December 20, 2009, subject to the law and regulations governing the payment of monetary benefits.

Entitlement to a TDIU is denied. 


____________________________________________
MICHAEL D. LYON 
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs